Opinion
 

 MOSK, J.
 

 In this matter we address the question whether plaintiffs in a malpractice action could subpoena the expert trial testimony of an investigator for the California Department of Health Services (hereafter DHS), or refer at trial to a draft preliminary report he prepared for the DHS, when the investigator had relied substantially on hospital peer review committee records in forming his opinions. The superior court granted a motion by the DHS to quash the subpoena; it also ruled that plaintiffs could not introduce or refer to the draft preliminary report summarizing his conclusions.
 

 
 *535
 
 As will appear, we conclude that the superior court properly excluded the testimony and draft preliminary report of the DHS investigator, who reviewed the confidential hospital peer review materials in the course of his official duties. Accordingly, we affirm the judgment of the Court of Appeal.
 

 I
 

 Plaintiffs are Wendy Fox (hereafter Ms. Fox) and her husband, Richard B. Fox, M.D., who has staff privileges at Good Samaritan Hospital (hereafter the hospital), a defendant herein. In 1992, Ms. Fox underwent a colonoscopy procedure at hospital, performed by defendants Richard J. Kramer, M.D., and Michael J. Kushlan, M.D.
 

 In the procedure, the interior of the large intestine is examined for abnormalities by use of an endoscope, a flexible rod inserted through the rectum. Ms. Fox was informed of certain risks associated with the procedure, including bowel perforation and possible discomfort and pain; she gave her informed consent. The procedure was performed using a form of anesthesia known as “conscious sedation,” in which pain- and anxiety-relieving medication is administered that does not render the patient completely unconscious, permitting the patient to communicate discomfort and change positions as necessary.
 

 Ms. Fox was anxious when she arrived at the hospital and while awaiting the procedure, but said she “always gets this way” and wanted to go forward with the colonoscopy. During the procedure, she experienced pain and moaned or asked the physicians to wait or stop a moment; they did so, administered more medication, and, after she indicated that it was all right to continue, completed the procedure. She recalls that she moaned and asked the physicians to “wait a minute,” but otherwise does not remember anything about the procedure except two or three periods of consciousness, of two or three seconds each, during which she felt pain.
 

 In the recovery area, Ms. Fox dreamed that she screamed during the colonoscopy, begged the physicians to stop, and fought them off. In the succeeding days, she began to believe that she had been abused during the colonoscopy. She developed a fear of medical personnel and suffered from nightmares.
 

 Dr. and Ms. Fox complained to the hospital, which discussed the incident at a peer review committee meeting attended by Dr. Fox. Dr. Fox later claimed that one of the nurses who assisted at the colonoscopy stated at the meeting that Ms. Fox screamed during the procedure.
 

 
 *536
 
 In September 1993, Dr. and Ms. Fox commenced this action for malpractice, alleging, inter alia, that Ms. Fox was inappropriately sedated and that the physicians proceeded with the colonoscopy procedure after she withdrew her consent. They sought damages for injuries to Ms. Fox, including post-traumatic stress syndrome from the pain and trauma, and, on behalf of Dr. Fox, for loss of consortium.
 

 More than three years later, in November 1996, Dr. and Ms. Fox lodged a complaint with the DHS concerning the hospital’s handling of the colonoscopy procedure. Michael Schnitzer, M.D., was assigned to investigate. To this end, he interviewed Dr. Fox, examined Ms. Fox’s medical records, and reviewed the minutes of the hospital peer review committee meeting; he did not interview the physicians who performed the colonoscopy. He prepared a draft preliminary report dated November 22, 1996. The report was never finalized and the DHS took no administrative action against the hospital on the basis of the investigation.
 

 Shortly before trial, plaintiffs subpoenaed the DHS draft preliminary report; they received a redacted copy from DHS counsel on January 29, 1997. Several paragraphs of the report were blacked out or crossed out. The unredacted portions of the report summarized the allegation that Ms. Fox had asked the physicians to stop the colonoscopy procedure. The report included a section entitled “Conclusions”; its first subsection, “Patient’s Rights,” which was crossed out and initialed by Dr. Schnitzer, states that “the patient at the time of the procedure was in obvious distress and the procedure should have been stopped.” The last page of the report recites facts from Dr. Kramer’s “operative report” to the effect that Ms. Fox was extremely anxious at the beginning of the procedure and was crying, panting, and hyperventilating. The final paragraph states: “During [Ms.] Fox’s procedure, even though her mind was clouded by the medication given, I believe she did ask her physicians to stop the procedure and her wishes were not respected. She did not receive appropriate considerate and respectful care.”
 

 Four days before trial, Dr. and Ms. Fox moved to augment their expert list to include Dr. Schnitzer and subpoenaed his testimony. The DHS, through the Attorney General, moved to quash the subpoena on the ground that Dr. Schnitzer’s conclusions relied on hospital peer review materials unavailable to the public under Evidence Code section 1157, but produced to the DHS in confidence in compliance with its statutory mandate to oversee the licensing and regulation of California hospitals. The DHS contended that Dr. Schnitzer’s opinions and conclusions were also entitled to the “official information” privilege of Evidence Code section 1040, because he could not
 
 *537
 
 testify “without immediately implicating and compromising the confidentiality of the materials he reviewed.”
 

 Dr. Schnitzer submitted a declaration averring that he had “relied substantially upon the peer review materials” in formulating his understanding of the facts and in reaching the opinions and conclusions in the draft preliminary report; although he had reviewed other materials in the course of the investigation he was unable to offer opinion testimony without reference to and reliance on the hospital peer review committee records. The superior court granted the motion to quash.
 

 At the hearing on the motion, plaintiffs also sought to subpoena Dr. Schnitzer as an expert on patient’s rights; that motion, too, was denied. The superior court explained: “It is inappropriate at this late stage to introduce Dr. Schnitzer. It appears that he very well may not be competent to testify in the area indicated. In addition, it is certainly very late in the game, too late in the game at this point, to call him in.”
 

 Dr. Kramer and Dr. Kushlan made a motion in limine, citing Evidence Code section 1157, to instruct Dr. and Ms. Fox “to at no time, or in any manner, allude to, reference, or disclose to the jury that peer review/quality assurance meetings were conducted” at the hospital after the procedure performed on Ms. Fox. The motion was granted.
 

 The hospital made a motion in limine to exclude evidence of the DHS investigation, including the draft preliminary report prepared by Dr. Schnitzer, as inadmissible hearsay and as privileged from disclosure under Evidence Code section 1157; it also argued that the hospital peer review committee records were inadmissible under Evidence Code section 1151, as evidence of subsequent remedial review. At the hearing on the motion, the hospital urged that the issue was moot “unless Dr. Schnitzer is going to testify.” The motion was denied as moot.
 

 Trial commenced in February 1997. Experts, including specialists in gastroenterology and anesthesiology, testified that the colonoscopy procedure was performed within the standard of care. Expert testimony was also given to the effect that the medication used in conscious sedation can cause hallucinations and fantasies in some patients. There was also expert testimony concerning Ms. Fox’s alleged posttraumatic stress disorder. One expert testified that she satisfied several diagnostic criteria for malingering. The expert observed in this connection that Ms. Fox’s claims that she could not go to medical or dental appointments after the colonoscopy were contradicted by her own medical records. Ms. Fox’s prior therapist testified that
 
 *538
 
 she was unsure whether Ms. Fox’s goal had been to regain her mental health or to build a case for trial.
 

 In March 1997, the jury reached a unanimous verdict for the hospital and Drs. Kramer and Kushlan.
 

 Dr. and Ms. Fox appealed, contending, inter alia, that the superior court erred in excluding Dr. Schnitzer’s testimony and the DHS report. The Court of Appeal affirmed. It held that hospital peer review evidence was inadmissible under Evidence Code section 1151 to prove negligence or culpable conduct. It acknowledged the absence of California authority in point, but was “convinced that such evidence constitutes subsequent remedial or precautionary measures within the meaning of section 1151.” It pointed to the “overwhelming public policy favoring the confidentiality of peer review evidence in a malpractice context,” and the “logical application” to “postaccident investigations” of case law affirming that Evidence Code section 1151 encompasses workplace discipline.
 

 We granted review; we now affirm the judgment, but not the reasoning, of the Court of Appeal.
 

 II
 

 In
 
 Arnett v. Dal Cielo
 
 (1996) 14 Cal.4th 4 [56 Cal.Rptr.2d 706, 923 P.2d 1], we explained the function of hospital peer review committees as follows. “Every licensed hospital has a formally organized and self-governing
 
 medical staff
 
 responsible for ‘the adequacy and quality of the medical care rendered to patients in the hospital.’ (Cal. Code Regs., tit. 22, § 70703, subd. (a).) The medical staff is required to adopt rules for ‘appropriate practices and procedures to be observed in the various departments of the hospital’ (id., subd. (e)), and to keep minutes of its meetings and retain them in the hospital files (id., subd. (c)). The medical staff acts primarily through a number of
 
 peer review committees.
 
 These committees evaluate physicians applying for staff privileges, establish standards and procedures for patient care, assess the performance of physicians currently on staff, and review such matters as the need for and results of each surgery performed in the hospital, the functioning of the patient records system, the control of in-hospital infections, and the use and handling of drugs within the hospital.
 
 (Id.,
 
 subds. (b) and (d); . . .)”
 
 (Arnett
 
 v.
 
 Dal Cielo, supra,
 
 14 Cal.4th at p. 10, italics in original.)
 

 Records of peer review committee investigations are privileged from discovery under Evidence Code section 1157, subdivision (a), which provides in pertinent part: “Neither the proceedings nor the records of organized
 
 *539
 
 committees of medical. . . staffs in hospitals, or of a peer review body . . . having the responsibility of evaluation and improvement of the quality of care rendered in the hospital, . . . shall be subject to discovery.” The immunity described in the statute “extends to, first, the proceedings, and second, the records of the described staff committees.”
 
 (Matchett v. Superior Court
 
 (1974) 40 Cal.App.3d 623, 628 [115 Cal.Rptr. 317].) We have referred to the strong public interest in preserving the confidentiality of the medical peer review process. (See, e.g.,
 
 West Covina Hospital v. Superior Court
 
 (1986) 41 Cal.3d 846, 853 [226 Cal.Rptr. 132, 718 P.2d 119, 60 A.L.R.4th 1257].)
 

 Evidence Code section 1157, subdivision (a), “[b]y its terms . . . creates only a privilege against discovery from medical staff committees; it does not create a bar against introduction of evidence” otherwise properly obtained.
 
 (Alexander v. Superior Court
 
 (1993) 5 Cal.4th 1218, 1223, fn. 4 [23 Cal.Rptr.2d 397, 859 P.2d 96].) “Literally, section 1157 establishes an immunity from discovery but not an evidentiary privilege in the sense that medical staff records are excluded from evidence.”
 
 (Matchett v. Superior Court, supra,
 
 40 Cal.App.3d at p. 629, fn. 3.)
 

 In addition, Evidence Code section 1157, subdivision (b), provides that, with certain exceptions, “no person in attendance at a meeting of any of those committees shall be required to testify as to what transpired at that meeting.” By its terms, it precludes only compelled testimony; it does not create a bar against voluntary testimony.
 
 (West Covina Hospital v. Superior Court, supra,
 
 41 Cal.3d at p. 855.) As we explained, one purpose of the statute is to protect physicians who participate in peer review from the burden of discovery and court appearances in malpractice actions against their peers; such purpose is inapplicable when a physician is willing to testify voluntarily.
 
 (Id.
 
 at p. 852.)
 

 The privilege against discovery under Evidence Code section 1157 “ ‘expresses a legislative judgment that the public interest in medical staff candor . . . requires a degree of confidentiality. ... It evinces a legislative judgment that the quality of in-hospital medical practice will be. elevated by armoring staff inquiries with a measure of confidentiality.’ ”
 
 (West Covina Hospital
 
 v.
 
 Superior Court, supra,
 
 41 Cal.3d at p. 853.) “[Prohibiting involuntary testimony serves a fundamental legislative purpose. The obvious general purpose of section 1157 is to improve the quality of medical care in the hospitals by the use of peer review committees. ... If doctors who serve on such committees were subject in malpractice cases to the burdens of discovery and involuntary testimony on the basis of their committee work, the evidentiary burdens could consume large portions of the doctors’ time to
 
 *540
 
 the prejudice of their medical practices or personal endeavors and could cause many doctors to refuse to serve on the committees.”
 
 (Id.
 
 at pp. 851-852.)
 

 In
 
 Arnett,
 
 we narrowly construed the term “discovery” as used in Evidence Code section 1157, in accordance with its “well-established legal meaning of a formal exchange of evidentiary information between parties to a pending action.”
 
 (Arnett
 
 v.
 
 Dal Cielo, supra,
 
 14 Cal.4th at p. 24.) “[T]hat meaning does not include a subpoena issued ... by an administrative agency for purely investigative purposes.”
 
 (Ibid.)
 

 Evidence Code section 1040, subdivision (b), provides that “[a] public entity has privilege to refuse to disclose official information, and to prevent another from disclosing official information, if the privilege is claimed by a person authorized by the public entity to do so” and that “[disclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice . . . .” As used in the statute, “official information” means “information acquired in confidence by a public employee in the course of his or her duty and not open, or officially disclosed, to the public prior to the time the claim of privilege is made.”
 
 (Id.,
 
 subd. (a).)
 

 III
 

 The issue presented herein is a narrow one: could Dr. and Ms. Fox subpoena Dr. Schnitzer to give expert testimony or refer at trial to his draft preliminary report when his conclusions were based on hospital peer review committee records reviewed in the course of his official duties for a public agency? We conclude that the answer is
 
 no.
 

 The hospital’s peer review committee records were immune from discovery under Evidence Code section 1157, subdivision (a). The DHS was entitled to review the records only as part of its official, purely investigative, inquiry.
 
 (Arnett
 
 v.
 
 Dal Cielo, supra,
 
 14 Cal.4th at p. 24.) The fact of DHS review did not constitute a general waiver by the hospital of
 
 discovery
 
 immunity under Evidence Code section 1157, subdivision (a): the hospital peer review committee records did not lose their immunity from discovery simply because they were reviewed in the course of an administrative investigation.
 

 The superior court properly quashed the subpoena of Dr. Schnitzer on the ground that his testimony was based on his review of peer review committee
 
 *541
 
 records. It also properly granted the hospital’s motion in limine to exclude the DHS draft preliminary report, which contained a summary of Dr. Schnitzer’s conclusions after reviewing peer review materials. Dr. and Ms. Fox could not accomplish indirectly what was forbidden to them to do directly, i.e., obtain the equivalent of
 
 discovery
 
 of the contents of hospital peer review committee records, by subpoenaing the testimony or the report of the DHS investigator who reviewed them in the course of his public duties. When, as here, an expert has relied on privileged material to formulate an opinion, the court may exclude his testimony or report as necessary to enforce the privilege. (See
 
 Williamson v. Superior Court
 
 (1978) 21 Cal.3d 829, 834 [148 Cal.Rptr. 39, 582 P.2d 126];
 
 Shadow Traffic Network v. Superior Court
 
 (1994) 24 Cal.App.4th 1067, 1078-1079 [29 Cal.Rptr.2d 693]; see generally
 
 People
 
 v.
 
 Gardeley
 
 (1996) 14 Cal.4th 605, 618-619 [59 Cal.Rptr.2d 356, 927 P.2d 713];
 
 People
 
 v.
 
 Coleman
 
 (1985) 38 Cal.3d 69, 91 [211 Cal.Rptr. 102, 695 P.2d 189].)
 
 [1]
 

 Dr. and Ms. Fox argue that any privilege against disclosure of the contents of the DHS draft preliminary report was waived when the DHS produced it, in redacted form, in response to their subpoena. The argument fails. The preliminary conclusions stated in the DHS draft preliminary report were reached after review of confidential hospital peer review materials subject to immunity under Evidence Code section 1157, subdivision (a). As Dr. Schnitzer stated in his declaration, he “relied substantially upon the peer review materials ... in formulating [his] own understanding of the facts relating to Mrs. Fox’s treatment . . . [and] in reaching the opinions and conclusions stated in [his] preliminary report.” As discussed, the hospital, as the holder of the privilege under Evidence Code section 1157, subdivision (a), did not waive it by virtue of its mandatory cooperation with the DHS inquiry.
 

 Dr. and Ms. Fox also contend that the Dr. Schnitzer’s draft preliminary report should not have been excluded because Health and Safety Code section 1280, subdivision (e), makes “[a]ll inspection reports and lists of deficiencies . . . open to public inspection when the state department has received verification that the health facility has received the report from the state department.” The draft preliminary report, which included Dr. Schnitzer’s handwritten interlineations and extensive deletions and redactions, was obviously only an uncompleted draft, not a final “inspection
 
 *542
 
 report” by the DHS; nor had it been served on the hospital by the DHS.
 
 (Ibid.)
 
 In any event, the statute appears inapplicable because it applies to reports made as a result of periodic inspections pursuant to Health and Safety Code section 1279, not the type of report made here in response to a specific complaint lodged with the DHS.
 

 Dr. and Ms. Fox also urge that their subpoena to Dr. Schnitzer was a trial subpoena, not a discovery subpoena. They assert that the Evidence Code section 1157, subdivision (a), immunizes peer review materials only from the pretrial formal exchange of information between parties to a civil action, and does not confer immunity from subpoena at trial. They rely on
 
 Arnett
 
 v.
 
 Dal Cielo, supra,
 
 14 Cal.4th at page 24, which explained that the term “discovery” in Evidence Code section 1157 was to be given its “well-established legal meaning of a formal exchange of evidentiary information between parties to a pending action.” The distinction that they attempt to draw between the pretrial exchange of information and trial evidence does not withstand scrutiny; nor did we purport to suggest otherwise in
 
 Arnett.
 
 Evidence Code section 1157, subdivision (a), does not bar introduction of evidence voluntarily offered by a participant in the peer review proceedings or voluntarily produced in the course of discovery. But the purpose of the provision—preserving the confidentiality of hospital peer review proceedings—would clearly be undermined if a party in a civil action could obtain through a trial subpoena the same evidence that it was
 
 prohibited
 
 from obtaining through a pretrial discovery request, i.e., otherwise privileged materials. The Legislature could not have intended such an absurd result. The evidence at issue herein was not subject to compulsory process by a party to a civil action
 
 at any time.
 

 In addition, although the superior court did not expressly address the Attorney General’s argument that the subpoena should be quashed under Evidence Code section 1040, it would appear that the provision is dispositive. As discussed, the statute provides that a public entity may refuse to disclose official information if the privilege is claimed by a person authorized by it to do so and if such disclosure is against the public interest because the necessity for preserving the confidentiality outweighs the necessity for disclosure. In this case, the opinions of Dr. Schnitzer were based on “official information” within the meaning of Evidence Code section 1040— i.e., information acquired in confidence by a public employee in the course of his duty and not officially disclosed to the public. And the necessity of preserving such confidentiality with regard to hospital peer review committee records, which inures to the benefit of the general public by encouraging candid and uninhibited evaluations of physicians by their peers, greatly outweighs “the necessity of disclosure in the interest of justice” (Evid. Code, § 1040).
 

 
 *543
 
 Finally, Dr. and Ms. Fox urge that Dr. Schnitzer’s testimony should have been admitted at trial on the subject of Ms. Fox’s probable condition when she was under the treatment of Drs. Kramer and Kushlan, presumably based on his interview with Dr. Fox and review of the medical records. (See
 
 Wilson v. Gilbert
 
 (1972) 25 Cal.App.3d 607, 615 [102 Cal.Rptr. 31].) The record fails to indicate, however, that Dr. and Ms. Fox ever sought to elicit testimony from Dr. Schnitzer concerning Ms. Fox’s condition. An appellate court may not reverse a judgment because of the erroneous exclusion of evidence unless “[t]he substance, purpose, and relevance of the excluded evidence was made known to the [trial] court by the questions asked, an offer of proof, or by any other means.” (Evid. Code, § 354, subd. (a).) Accordingly, we decline to address the point.
 

 IV
 

 The Court of Appeal rested its conclusion that Dr. Schnitzer’s opinion testimony and the DHS draft preliminary report were inadmissible solely on Evidence Code section 1151, which provides: “When after the occurrence of an event, remedial or precautionary measures are taken, which, if taken previously, would have tended to make the event less likely to occur, evidence of such subsequent measures is inadmissible to prove negligence or culpable conduct in connection with the event.” It ruled that hospital peer review committee meetings qualify as subsequent “remedial or precautionary measures”
 
 (ibid.)
 
 because they typically involve evaluations of the performance and competence of physicians at the hospital, and may result in the revocation, limiting, or denial of staff privileges.
 

 The Court of Appeal pointed to “the strong public policy favoring the confidentiality of peer review evidence in the medical malpractice context” even at the cost of hindering plaintiffs from obtaining evidence. It quoted
 
 Matchett
 
 v.
 
 Superior Court, supra,
 
 40 Cal.App.3d at page 629, to the effect that Evidence Code section 1157 “represents a legislative choice between competing public concerns. It embraces the goal of medical staff candor at the cost of impairing [a] plaintiff[’s] access to evidence.” Holding hospital peer review committee records per se
 
 inadmissible
 
 under Evidence Code section 1151, as well as
 
 nondiscoverable
 
 under Evidence Code section 1157, would further advance the legislative goal of fostering medical staff candor, albeit at the additional cost of further limiting a plaintiff’s access to evidence of negligence or culpable conduct.
 

 The privileges set out under these provisions of the Evidence Code are legislative creations; courts do not have the power to expand them.
 
 (Roberts
 
 v.
 
 City of Palmdale
 
 (1993) 5 Cal.4th 363, 373 [20 Cal.Rptr.2d 330, 853 P.2d
 
 *544
 
 496]; cf.
 
 Trammel v. United States
 
 (1980) 445 U.S. 40, 50 [100 S.Ct. 906, 912, 63 L.Ed.2d 186] [evidentiary privileges “must be strictly construed and accepted ‘only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of using all rational means for ascertaining truth’ ”].)
 

 As a matter of statutory construction, the Court of Appeal’s conclusion appears strained. Evidence Code section 1151 plainly refers to “remedial or precautionary measures,” not to mere reports or investigations conducted after an accident or other event resulting in injury. By its terms, it would appear to include only
 
 subsequent actions taken to repair or correct
 
 a problem identified by an investigation—not the factual inquiries undertaken to determine whether such repair or correction was necessary. Evidence Code section 1151 also refers to measures “which,
 
 if taken previously,
 
 would have tended to make the event less likely to occur.” (Italics added.) Of course, reports or investigations relating to an incident could not have been made
 
 prior thereto.
 

 The Court of Appeal’s construction of the general provision of Evidence Code section 1151 also appears inconsistent with the Legislature’s enactment of the more specific provisions of Evidence Code section 1157, which expressly preclude only the discovery of peer review committee records and the use of involuntary testimony by a “person in attendance” at a meeting of a peer review committee. (Evid. Code, § 1157, subds. (a) & (b);
 
 West Covina Hospital
 
 v.
 
 Superior Court, supra,
 
 41 Cal.3d at p. 854.) Evidence Code section 1157, subdivision (b) provides only that a person is not
 
 “required
 
 to testify” as to what transpired at a peer review committee meeting (italics added); under Evidence Code section 1151, a person is not
 
 permitted
 
 to testify concerning subsequent remedial measures. “In the construction of a statute . . . when a general and particular provision are inconsistent, the latter is paramount to the former.” (Code Civ. Proc., § 1859.)
 

 The hospital and Drs. Kramer and Kushlan argue that the general and specific provisions are not inconsistent; the general provision, Evidence Code section 1151, bars only
 
 admissibility,
 
 not discovery, of any evidence showing subsequent remedial measures; the specific provision, Evidence Code section 1157, subdivision (a), bars only
 
 discovery,
 
 not admissibility, of hospital peer review committee records. They urge that the Legislature must have intended to protect hospital peer review committee evidence not only from admissibility, as a subsequent remedial measure, but also from discovery.
 

 Contrary to defendants’ argument, however, Evidence Code section 1157 expressly limits not only discovery but also specifies what evidence is
 
 *545
 
 subject to use at trial. Thus, compulsory testimony is expressly precluded under the statute, which provides, in subdivision (b), that “no person in attendance at a meeting of [a hospital peer review committee] shall be required to testify as to what transpired at that meeting.” The latter provision would be superfluous if the Legislature intended in every case that
 
 all
 
 evidence regarding hospital peer review was already inadmissible under Evidence Code section 1151 to prove negligence.
 
 [2]
 

 Moreover, the hospital and Drs. Kramer and Kushlan point to nothing in the language of the statutes or the legislative history supporting their speculations concerning legislative intent with regard to limiting the admissibility of hospital peer review committee records as subsequent remedial measures. In this regard, it is notable that other jurisdictions addressing the admissibility of peer review materials have done so expressly and unequivocally. For example, under Iowa law, decisions made in connection with service on a peer review committee are “not subject to discovery, subpoena, or other means of legal compulsion . . .
 
 and are not admissible in evidence
 
 in a judicial or administrative proceeding.” (Iowa Code § 147.135, subd. (2), italics added.) Similarly, the Kentucky statute governing peer review evidence provides that it “shall not be subject to discovery, subpoena,
 
 or introduction into evidence,
 
 in any civil action.” (Ky. Rev. Stat. Ann. § 311.377, subsection (2), italics added.) We assume that if our Legislature intended to enact a similar restriction regarding admissibility, it, too, would have done so directly.
 

 The Court of Appeal pointed out that peer review may result in disciplinary action and emphasized that employer disciplinary actions have long been held to constitute remedial measures. (See
 
 Turner
 
 v.
 
 Hearst
 
 (1896) 115 Cal. 394, 401 [47 P. 129] [evidence concerning the termination of a reporter was inadmissible in a negligence action because it was similar to proof of taking precaution after an accident].) It reasoned that the
 
 investigation
 
 of employee misconduct by hospital peer review committees “cannot sensibly be treated differently,” but should be viewed as constituting a “remedial measure” under Evidence Code section 1151.
 

 In this matter, however, no evidence was presented to show that the hospital peer review committee was convened to investigate misconduct by
 
 *546
 
 Drs. Kramer and Kushlan or that it reached the conclusion that they acted improperly. Nothing in the record indicates that any changes were made in the hospital’s protocol for colonoscopy procedures, or that any disciplinary action was taken to make the alleged harm less likely to occur in the future.
 

 The Court of Appeal, acknowledging that there is no California case law in point, drew a broad analogy to a Massachusetts decision,
 
 Martel
 
 v.
 
 Mass. Bay Transp. Authority
 
 (1988) 403 Mass. 1 [525 N.E.2d 662, 664], which held that the results of a bus company’s investigation into the causes of an accident involving one of its drivers was properly excluded as evidence of a subsequent remedial measure. The Court of Appeal also cited
 
 Maddox
 
 v.
 
 City of Los Angeles
 
 (9th Cir. 1986) 792 F.2d 1408, 1417, which held, without extensive discussion, that testimony given at a police disciplinary hearing was properly excluded under Federal Rules of Evidence, rule 407 (28 U.S.C.), the federal equivalent of Evidence Code section 1151.
 
 [3]
 

 The weight of out-of-state authority, however, is to the contrary. Most courts addressing analogous provisions concerning evidence of subsequent remedial measures distinguish between an investigation and actual steps taken to correct a problem; post-event investigations do not themselves constitute remedial measures, although they might provide the basis for such measures.
 

 Thus, in
 
 Rocky Mountain Helicopters v. Bell Helicopters
 
 (10th Cir. 1986) 805 F.2d 907, the Tenth Circuit Court of Appeals rejected the argument that evidence of a stress study of helicopter design conducted after a helicopter accident constituted remedial measures. It explained: “It would strain the spirit of the remedial measure prohibition in Rule 407 to extend its shield to evidence contained in post-event tests or reports. It might be possible in rare situations to characterize such reports as ‘measures’ which, if conducted previously, would reduce the likelihood of the occurrence. Yet it is usually sounder to recognize that such tests are conducted for the purpose of investigating the occurrence to discover what might have gone wrong or right. Remedial measures are those actions taken to remedy any flaws or failures indicated by the test. . . . [¶] We believe that the policy considerations that underlie Rule 407, such as encouraging remedial measures, are not as vigorously implicated where investigative tests and reports are concerned. To the extent that such policy concerns are implicated, they
 
 *547
 
 are outweighed by . . . the danger of depriving ‘injured claimants of one of the best and most accurate sources of evidence and information.’ ”
 
 (Id.
 
 at pp. 918-919.)
 

 Westmoreland
 
 v.
 
 CBS, Inc.
 
 (S.D.N.Y. 1984) 601 F.Supp. 66, 67, similarly held that the doctrine excluding subsequent remedial measures to show culpable conduct does not extend that far. “The fact that subsequent remedial measures are excluded as admissions of fault does not mean that competent evidence resulting from an internal investigation of a mishap must also be excluded. . . . [¶] . . . The question of social policy raised ... is whether in order to encourage such investigations, their fruits should be shielded from use by adverse claimants. There is, however, no such doctrine either as to the internal investigative report or as to facts revealed by it.” (See also, e.g.,
 
 Prentiss & Carlisle Co. v. Koehring-Waterous.
 
 (1st Cir. 1992) 972 F.2d 6, 10 [“The fact that the analysis may often result in remedial measures being taken . . . does not mean that evidence of the analysis may not be admitted”];
 
 Misener v. General Motors
 
 (D. Utah 1996) 924 F.Supp. 130, 133;
 
 Fasanaro v. Mooney Aircraft Corp.
 
 (N.D.Cal. 1988) 687 F.Supp. 482, 487;
 
 Ensign
 
 v.
 
 Marion County
 
 (1996) 140 Or.App. 114, 118 [914 P.2d 5, 7];
 
 Ellis
 
 v.
 
 Grand Trunk Western Ry. Co.
 
 (1981) 109 Mich.App. 394 [311 N.W.2d 364, 367]; 2 Weinstein et al., Federal Evidence (2d ed. 1997) § 407.06[1], pp. 407-27 to 407-28 [“It is only if changes are implemented as a result of the tests that the goal of added safety [under Fed. Rules Evid., rule 407] is furthered; and even then, it is only evidence of those changes that is precluded by the rule.”].)
 

 More specifically, although most states have granted statutory protection to medical peer reviews of patient care (see
 
 Sanderson
 
 v.
 
 Frank S. Bryan, M.D., Ltd.
 
 (1987) 361 Pa.Super. 491, 495, fn. 3 [522 A.2d 1138, 1140] [listing statutes of 46 states]), the Court of Appeal pointed to no other case in any state that has relied on the statutory (or common law) rule barring admission of evidence of subsequent remedial measures as authority for broadening express statutory protections for hospital peer review committee records. The hospital and Drs. Kramer and Kushlan also come up empty-handed.
 

 Recently, in
 
 Syposs
 
 v.
 
 U.S.
 
 (W.D.N.Y. 1998) 179 F.R.D. 406, a federal district court rejected a claim that it should recognize a new federal common law privilege for hospital peer review materials. Emphasizing that privileges are generally disfavored in the law and must be strictly construed, it observed that the United States Supreme Court has refused to recognize a
 
 *548
 
 federal common law privilege for the peer review materials of a university.
 
 (Id.
 
 at p. 409, citing
 
 University of Pennsylvania v. EEOC
 
 (1990) 493 U.S. 182, 189 [110 S.Ct. 577, 582, 107 L.Ed.2d 571].) It also cited other federal decisions refusing to recognize a common law federal privilege for hospital peer review materials on the basis that the failure of Congress to expressly enact such a privilege was “ ‘evidence that Congress did not intend these records to have the level of confidentiality and protection advanced by the hospitals ....’”
 
 (Syposs v. U.S., supra,
 
 179 F.R.D. at p. 410.) Pointing to Congress’s enactment of statutes expressly declaring certain medical quality assurance records to be privileged, it observed: “These examples demonstrate that Congress is cognizant of medical peer review and the need for such information to be protected from disclosure and used as evidence. However, these legislative examples also show that, in creating the new privilege, Congress carefully limited [its] scope . . . . [f] . . . [G]iven the general principle that privileges are strongly disfavored . . . , this court is unwilling to find a privilege where ‘it appears that Congress has considered the competing concerns and [did] not establish a privilege.’ . . . Whether the public interest would be served by a medical peer review privilege in federal cases requires a weighing of interests more appropriate for Congress than for the courts.”
 
 (Id.
 
 at pp. 411-412.)
 

 Similarly here, we need not resolve for all purposes the general question whether post-event investigation can ever be deemed a “remedial measure”—e.g., because it is so inextricably bound up with disciplinary or other corrective action. At least with regard to the admissibility of hospital peer review committee records, it is clear that the Legislature is cognizant of hospital peer review and the need for such information to be protected; it considered the competing concerns and did
 
 not
 
 establish a broad general privilege for peer review materials. There is no special rule against the admissibility of peer review committee material. The general rule against the admissibility of subsequent remedial measures to prove culpability is inapplicable.
 

 Finally, the hospital and Drs. Kramer and Kushlan raise numerous policy arguments for additional protections for peer review materials. Their arguments for restriking the balance between the public interest in confidentiality and the plaintiff’s interest in access to relevant information are more appropriately addressed to the Legislature. (See
 
 Arnett v. Dal Cielo, supra,
 
 14 Cal.4th at p. 29.)
 

 
 *549
 
 V
 

 For the foregoing reasons, we affirm the judgment of the Court of Appeal.
 

 George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.
 

 [1]
 

 The hospital and Drs. Kramer and Kushlan suggest that Dr. and Ms. Fox lodged a complaint with the DHS years after the incident for the sole purpose of gaining access to privileged peer review committee information that they were unable to obtain through discovery. Whatever the actual motives of Dr. and Ms. Fox, it would clearly contradict legislative intent to permit parties to manipulate the DHS investigative process in order to accomplish an end run around the discovery bar of Evidence Code section 1157.
 

 [2]
 

 We do not intend to suggest that application of both Evidence Code sections 1157 and 1151 to the same materials is
 
 precluded
 
 under all circumstances. Thus, in the appropriate case, even voluntary testimony by a participant in peer review proceedings about the implementation of subsequent remedial measures could be excluded under Evidence Code section 1151 to show negligence. This is not such a case.
 

 [3]
 

 Rule 407 of the Federal Rules of Evidence (28 U.S.C.) provides, in pertinent part: “When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, [or] culpable conduct. . . .”