SUTIN, Judge (dissenting). {42} I respectfully dissent. Dr. Yedidag’s private right of action and implied promise claims should have been dismissed. {43} Paragraph 2 of the employment agreement entitled “Establishment of Professional Relationship” required Dr. Yedidag to “render professional medical services and such reasonable administrative and management services as may be delegated to [him] ... in accordance with all of the terms and conditions of [the agreement.” Dr. Yedidag was also required to “devote full time and attention, with [his] best endeavors and skill for the interest, benefit[,] and best advantage of [Eastern].” Paragraph 5.1(d) of the employment agreement imposed upon Dr. Yedidag the duties of “providing professional medical services and conducting professional duties in accordance with applicable law and with the current medical standards in the community[.]” Paragraph 10.1 of the Agreement sets out fifteen separate events the occurrence of which permitted Eastern to terminate the employment agreement. Among the events were: (j) [Eastern’s] determination that [Dr. Yedidag’s] continued employment would pose an unreasonable risk of harm to patients or others or would adversely affect the confidence of the public in the services provided by [Eastern]; (k) [Eastern’s] determination that [Dr. Yedidag] has engaged in gross insubordination or gross dereliction of duty; (m) conduct by [Dr. Yedidag] which is reasonably considered by [Eastern] to be unethical, unprofessional,... or adverse to the interest, reputation[,] or business of [Eastern.] The employment agreement and thus Dr. Yedidag’s employment were terminated pursuant to Paragraphs 10.1 (j), (lc), and (m) of the agreement. {44} Eastern’s termination letter addressed to Dr. Yedidag stated: As you recall, at a meeting on August 3, 2006, you were advised that the behaviors you exhibit with employees, Hospital administration, and other members of the Hospital’s [m]edical [s]taff must cease, including, but not limited to, your continued unprofessional behavior and language. We outlined these issues in a letter to you dated August 4,2006. In the meeting, and again in the letter, we cautioned that failure to comply would result in immediate suspension and possible termination of the employment agreement. Your continued disruptive behavior violates the provisions set forth above, indicates you cannot or will not conform your behavior, and leads us to conclude that termination of your employment is the only practical remedy. Paragraph 10.2 of the employment agreement states that “if either party fails to perform or commits a material breach of any provision in this [agreement . . . then the other party thereafter may immediately terminate this [a]greement[.]” Paragraph 10.3 extends to the parties “any other rights and remedies that the parties may have at law or in equity.” Paragraph 20 entitles the prevailing party in an action to enforce the employment agreement to reasonable attorney fees. {45} Several aspects of Dr. Yedidag’s case and briefs show that this case was nothing more than a breach of employment contract case. He could have sued on the basis that insufficient grounds existed to support termination of the agreement. In such an action, he could have attempted, for example, to show that the termination was based on specious or clearly insubstantial grounds or that relying on the peer review conduct was purely pretextual or a ruse or hidden agenda to complete a decision already made to terminate, perhaps even with malicious motive. {46} Noteworthy in that regard is Dr. Yedidag’s answer brief statement: “Eastern’s discharge of Dr. Yedidag for unprofessional conduct was in violation of the express terms of its agreement with [him], whether or not that agreement also implied that he could not be discharged for peer review participation.” (Emphasis added.) Dr. Yedidag argues that “[the] breach empowered] others than Dr. Ali ... to use the peer review meetings to harm” Dr. Yedidag. (Emphasis added.) In an entire section of his answer brief, Dr. Yedidag takes the position that the discharge violated not only alleged implied terms, but also the express terms of the employment agreement. Dr. Yedidag also takes the position that the implied promise he asserts constitutes an exception to the express provision of Paragraph 10.1(m) of the employment agreement, which provides that grounds for termination include unprofessional conduct or conduct adverse to the interest, reputation, or business of Eastern. And Dr. Yedidag consistently implies that Eastern’s motives were improper, including that it had a financial stake in the outcome of a review committee proceeding. These comments indicate that Dr. Yedidag’s claim presented to the jury could and should have been that Eastern breached the agreement because Eastern lacked a justifiable basis on which to terminate the agreement under Paragraph 10.1 of the agreement. {47} Thus, the action that should have been pursued by Dr. Yedidag but was not pursued was a common law action based on breach of the agreement for failure to justifiably or lawfully terminate the agreement under Paragraph 10.1. New Mexico cases reflect actions for breach of an employment agreement. See, e.g., Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶¶ 1, 19, 21, 121 N.M. 728, 918 P.2d 7 (reversing summary judgment in favor of an employer and remanding the case to allow the employee to pursue his breach of employment contract claim based on the existence of a written employment contract); Danzer v. Prof'l Insurors, Inc., 101 N.M. 178, 180, 679 P.2d 1276, 1278 (1984) (reviewing a challenge to the amount of damages awarded to an employee for an employer’s breach of their employment agreement); cf. UJI 13-2306 NMRA (stating that if the employer agreed that the employee could be discharged only for cause, the employer could discharge the employee without violating the agreement if the employer in fact had a sufficient cause to justify the discharge of the employee and that belief was reasonable). And cases reflect actions for wrongful discharge, alleging an implied contract based in part on an employee handbook. See, e.g., Hudson v. Vill. Inn Pancake House of Albuquerque, Inc., 2001-NMCA-104, ¶ 4, 131 N.M. 308, 35 P.3d 313; cf. UJI 13-2302 NMRA (discussing that wrongful discharge can be considered when an employee claims an implied agreement that he or she could be discharged only for cause). Perhaps Dr. Yedidag should not have dropped his claim for retaliatory discharge. See UJI 13-2304 NMRA (containing the instruction for retaliatory discharge). Notably, Dr. Yedidag did seek recovery for common law breach of contract on the limited basis of Eastern’s alleged failure to follow “the procedural requirements guaranteed under the medical staff by-laws to being designated a disruptive employee” by not providing for any appeal process as to such designation. The jury expressly rejected that claim. {48} It appears that Dr. Yedidag consciously chose to take the private right of action and implied promise approaches so as not to have to litigate the factual basis for Eastern’s termination of the employment agreement under the express termination provision in Paragraph 10.1. As indicated earlier in this dissenting opinion, approximately three months before the peer review process took place, Eastern had advised Dr. Yedidag that the behaviors he exhibited with hospital employees, administration, and other members of the medical staff “must cease, including but not limited to, [his] continued unprofessional behavior and language.” Dr. Yedidag was also “cautioned that failure to comply would result in immediate suspension and possible termination}.]” After the peer review meeting involving Dr. Ali, Eastern terminated the agreement with Dr. Yedidag. No Implied Statutory Right to Sue or Implied Promise Exists {49} “The ROIA establishes a medical peer review process to promote the improvement of health care in New Mexico. Further, it recognizes that candor and obj ectivity in the critical evaluation of medical professionals by medical professionals is necessary for the efficacy of the review process.” Sw. Cmty. Health Servs., 107 N.M. at 198, 755 P.2d at 42. To effectuate that process, the ROIA provides immunity from damages for the medical professionals who participate as members of a peer review committee so that they are not discouraged from “participating in effective professional peer review.” Summers v. Ardent Health Servs., L.L.C., 2011-NMSC-017, ¶ 13, 150 N.M. 123, 257 P.3d 943 (discussing the policy of utilizing professional peer review actions to assure quality health care under ROIA and the Health Care Quality Improvement Act, 42 U.S.C. §§ 11101-11152 (1986)) (internal quotation marks and citation omitted) ; see NMSA 1978, §§ 41-9-3, -4 (1979). {50} Section 41-9-3 limits the liability of persons providing information to the review organization, and under Section 41-9-4 liability of members of the review organization is limited. For our purposes here, a “review organization” is defined as “an organization whose membership is limited to health care providers and staff. . . and which is established by a health care provider which is a hospital ... to gather and review information relating to the care and treatment of patients for [various] purposes}.]” Section 41-9-2(E). Among the eight enumerated purposes of the peer review process are “(1) evaluating and improving the quality of health care services rendered in the area or by a health care provider; (2) reducing morbidity or mortality;... [and] (8) determining whether a health care provider shall be granted authority to provide health care services using the health care provider’s facilities or whether a health care provider’s privileges should be limited, suspended},] or revoked.” Section 41-9-2(E)(1), (2), (8). {51} Dr. Yedidag characterizes the circumstances of the termination of the employment agreement as follows: “Dr. Yedidag was discharged for persistently questioning Dr. . . . Ali . . . during a peer review meeting about a botched surgical procedure in which Dr. Ali missed one of two tumors he had attempted to remove [from a patient’s] colon” and about a second surgical procedure performed by Dr. Ali that resulted in the patient’s death. I refer generally to the particular subject of the peer review process as a “target” of the process. In this case, the obvious target of the peer review meeting was Dr. Ali. {52} Section 41-9-4 would be the immunity focus were Dr. Ali to have sued Dr. Yedidag. The doctor-member’s involvement in the peer review process and the target’s activities are what Section 41-9-4 addresses in terms of limitation of the doctor-member’s liability. It is noteworthy that the doctor-member has only qualified, not absolute, immunity. Leyba, 114 N.M. at 687, 845 P.2d at 781. {53} Here, however, we have Dr. Yedidag suing his employer for violating Section 41-9-5 of the ROIA. Section 41-9-5(A) states that “all data and information acquired by a review organization in the exercise of its duties and functions shall be held in confidence and shall not be disclosed to anyone except to the extent necessary to carry out one or more of the purposes of the review organization}.]” It further prohibits those persons who are protected in Section 41-9-4 from “disclosing] what transpired at [the] meeting . .. except to the extent necessary to carry out one or more of the purposes of the review organization}.]” Section 41-9-5(A). I read the confidentiality and disclosure provisions in Section 41-9-5 to exist primarily to protect a target because the target is precluded under Section 41-9-4 from suing those protected under Section 41-9-5. The protection consists of the threat of criminal prosecution under Section 41-9-6 against any person who improperly discloses data or information acquired in the process that could harm the target. {54} I acknowledge that Section 41-9-5 appears to be broad enough to cover the improper disclosure of data and information acquired by the review organization that have the potential of harming persons other than the target. Nevertheless, no New Mexico case has addressed that question, and Dr. Yedidag’s attempt to support the breadth of the disclosure provision with any case law fails. Dr. Yedidag cites one case, Fox v. Kramer, 994 P.2d 343 (Cal. 2000), for the proposition that he is protected. Fox does not assist Dr. Yedidag in any regard. {55} Fox involved discovery in a civil malpractice action of a health department expert who reviewed confidential hospital peer review materials. Id. at 345, 348. The malpractice action had been filed by an injured patient against the target of the peer review process. Id. at 345-46. The California Supreme Court, in discussing the pertinent statute, stated that one of its purposes was “to protect physicians who participate in peer review from the burden of discovery and court appearances in malpractice actions against their peers; such purpose is inapplicable when a physician is willing to testify voluntarily.” Id. at 348. Fox simply protects a physician who participates in peer review from discovery and involuntary testimony in a malpractice action against the target of a peer review process. Fox in no way protects the participating physician from disciplinary action by a hospital-employer based on information received by the hospital of that physician’s improper, unprofessional conduct during the process. {56} The ROIA should not be interpreted under the National Trust factors to provide for a private right of action for violation of the disclosure provision. See Nat'l Trust, 117 N.M. at 593, 874 P.2d at 801. Assuming that Section 41-9-5 was intended to protect a class that includes a doctor-member of a peer review board for some purposes, the class being protected in the statute should not be read to include a doctor at risk for being disciplined by the hospital for unprofessional conduct. No part of the statute governs personnel matters, including discipline for unprofessional conduct. If the Legislature intended the statute to relate to personnel matters, it would have said so. Nothing in the statute evidences a legislative intent, expressly or implicitly, to create in the doctor-member of a peer review board a private right of action or remedy based on Eastern’s disciplinary action taken under the express provisions of the employment agreement. If the Legislature intended to create such right or remedy, it would have said so. The Legislature instead provided for criminal sanction. {57} Further, the term “transpired” as it is used in Section 41-9-5 cannot be read to prohibit the disclosure of contractually prohibited unprofessional conduct of doctor-members of a peer review board during a meeting. In addition, to the extent that the Legislature intended to prohibit the disclosure of anything beyond data and information, it cannot have intended “transpired” to provide absolute immunity from discipline for unprofessional conduct of a participating doctor-member, who, as an employee of the hospital, could be fired for such conduct under an employment agreement. Yet absolute immunity from discipline is what the district court created. By interpreting “transpired” as covering anything Dr. Yedidag said or did, the district court established as a matter of law absolute immunity for him from termination under the employment agreement or, for that matter, from any sort of further disciplinary warnings for any conduct during the process. O ddly, under the district court’s interpretation, Dr. Yedidag has absolute immunity from such adverse employment action (which, hereafter, for simplicity, I refer to as “discipline”), but only qualified immunity from suit by the target. {58} “Transpired” must be interpreted in the context of the statute as a whole. Nothing in the context of the entire statute reasonably or rationally permits an interpretation of that term to mean unprofessional conduct of a doctor for which the doctor could and should be disciplined were the conduct to have occurred outside of the meeting. One can easily think of conduct that in no way could reasonably or justifiably be considered protected such that disclosure of it solely for discipline purposes would be subject to criminal prosecution. {59} For example, one has to seriously doubt that the Legislature intended to grant immunity to Dr. Yedidag from discipline were he to have persistently examined Dr. Ali with brow-beating nastiness, venomous profanity, or ethnic slurs. What if Dr. Yedidag examined a target stating that the target was a *&@**!!$ quack and a no-good ignorant liar that killed the patient and deserved to go to jail or have his knees broken or worse, even were that stated as his opinion? One has to seriously doubt that the Legislature intended to absolutely immunize from discipline a doctor-member’s dragged or inebriated state, or words or conduct that come within the proscriptions against discrimination based on race, religion, sex, ethnicity, etc. And one must seriously doubt that the Legislature would intend that sort of conduct to fit within the idea of the acquisition of data and information to carry out the purposes of the review organization. {60} It goes without saying that Eastern has an obligation to protect the public as well as its own staff from doctors who engage in unprofessional conduct. This obligation should supercede any notion that the hospital should refrain from discipline so as not to “chill” a doctor’s participation in the peer review process where the conduct in question is unacceptable and subject to discipline. The peer review process cannot be so sacrosanct as to forbid discipline for unprofessional conduct. The district court’s ruling meant that nothing a doctor-member does or says during a meeting, no matter what, can be disclosed for discipline purposes. Under that ruling, no discipline could occur even if the conduct was such that it would adversely affect medical care and constitute just and good cause for discipline. Respectfully, the ruling simply makes little sense. It expands the law beyond good reason. {61} Along the same line, the disclosure of Dr. Yedidag’s conduct to Eastern for disciplinary purposes comes within the Section 41 -9-5(A) exception of disclosures “necessary to carry out one or more of the purposes of the review organization^]” The disclosure of Dr. Yedidag’s conduct can be viewed as coming within the purpose of the review organization relating to the care and treatment of patients for at least one or more of the eight purposes expressly enumerated in Section 41-9-2(E). {62} Further, absolute immunity from discipline through a private or implied right of action frustrates an underlying purpose of the ROIA, in that the peer review process is to enhance the provision of good, professional medical care. To absolutely immunize a doctor-member’s unprofessional conduct precludes the hospital from assuring that doctors who engage in such conduct are disciplined. It is unreasonable to assume that either the Legislature under the ROIA or Eastern under the employment relationship intended to create or promise by implication a circumstance in which Eastern would forego its responsibility to the public and its own staff to discipline a wayward doctor in exchange for requiring the doctor as part of his or her employment to participate in the peer review process. {63} I see nothing in the ROIA that permits a divination that the Legislature intended to permit a doctor to sue the hospital for violating the disclosure clause when the “disclosure” was behavior during a peer review process that constitutes an express basis of termination under an employment agreement. Nor do I see any basis on which to create an implied promise that Eastern would refrain from any disciplinary action growing out of a member’s conduct in a peer review meeting. Dr. Yedidag cites no case that supports his position that he should have absolute or, for that matter, even a qualified immunity, from discipline. His citations to Summers and Southwest Community Health Systems provide nothing more than general statements as to the goal and purpose of peer review legislation. {64} If permitting discipline tends to chill the peer review process, then rather than the court creating, as it does here, a claim for a ROIA violation or an implied promise, permitting absolute immunity from discipline, the court should leave it to the Legislature to make clear what the more important policy to implement is for the overall policy goal of enhancing medical care. {65} Eastern presents cases from other jurisdictions indicating that courts will not create a private right of action when the statutes provide criminal penalties for violations but do not specifically provide for a private right of action. Dr. Yedidag cites no case to the contrary. In fact, he cites no case that has held that a doctor-member of a peer review committee has a private right of action under a peer review statute to sue his or her hospital-employer for a violation of a confidentiality clause in the statute. At most, if a violation of the ROIA has allegedly occurred, the violation should be used, if at all, only as evidence to support a claim for breach of the employment agreement. {66} It is noteworthy that the jury expressly rejected Dr. Yedidag’s claim asserting breach of the implied-in-law covenant of good faith and fair dealing. Even were the implied covenant of good faith and fair dealing an issue, that covenant “cannot be used to overcome or negate an express term contained within a contract.” Sanders v. FedEx Ground Package Sys., Inc., 2008-NMSC-040, ¶ 8, 144 N.M. 449, 188 P.3d 1200. Nor can the covenant be construed to imply “new, independent rights or duties not agreed upon by the parties.” A.I. Transp. v. Imperial Premium Fin., Inc., 862 F. Supp. 345, 348 (D. Utah 1994) (internal quotation marks and citation omitted). {67} In addition, and more important, nothing in the employment agreement or the evidence supports any implied-in-fact covenant that can be based on the parties’ intentions. See Davis v. Devon Energy Corp., 2009-NMSC-048, ¶ 33, 147 N.M. 157, 218 P.3d 75 (“[I]f a covenant or promise does not operate to impose a duty as a matter of law, any implied obligation must arise from the parties’ intentions.”). “[I]mplied covenants are not favored in law, especially when a written agreement between the parties is apparently complete.” Cont’l Potash, Inc. v. Freeport-McMoran, Inc., 115 N.M. 690, 704, 858 P.2d 66, 80 (1993). Such a covenant cannot co-exist with or override express provisions of the parties’ agreement. Davis, 2009-NMSC-048, ¶ 29; Cont’l Potash, 115 N.M. at 704, 858 P.2d at 80; Winrock Inn Co. v. Prudential Ins. Co. of Am., 1996-NMCA-113, ¶ 18, 122 N.M. 562, 928 P.2d 947. {68} Finally, the manner in which this case was presented to the jury through the instructions was virtually and effectively a direction to reach a verdict of violation of the statute, leaving only the causation and damages issues for jury consideration. In my view, this was further error requiring reversal. {69} Instruction No. 4 reads, in pertinent part, that Dr. Yedidag sought damages that he claims were caused by Eastern’s breach of the confidentiality requirement in the ROIA and that to establish a violation, Dr. Yedidag had to prove that “[h]is words or actions . . . were protected from disclosure!)]” Instruction No. 7 quoted the ROIA’s disclosure provision and then stated: “Transpired means anything that occurred, happened, or took place.” The instruction then stated, “[i]f you find from the evidence that Eastern’s employees violated [the] statute then Eastern’s conduct constitutes negligence as a matter of law.” No instruction defined or explained negligence or negligence per se. The fact of “disclosure” was not an issue. The court was instructing the jury that Dr. Yedidag’s words or actions necessarily transpired during the meeting and were protected from disclosure and that Eastern violated the statute. {70} The special verdict form then asked whether Eastern violated the ROIA and, if so, whether the violation caused Dr. Yedidag’s damages. The special verdict form states that if the answers are “yes” to these questions, the jury should proceed to award damages in accordance with the damage instruction given by the court. Nothing in the special verdict form mentions negligence or disclosure. {71} The aggregate of the instructions and the special verdict form tells the jury under no uncertain terms that any and all of Dr. Yedidag’s words or actions at the peer review meeting were protected under the ROIA from disclosure and, upon the disclosure by Eastern’s employees of any of his words or actions, Eastern violated the ROIA. The jury had little choice but to answer “yes” on the special verdict form to the question whether Eastern violated the ROIA and then move on to causation. {72} When asked in oral argument whether some action or conduct by a doctor-member might be disclosable and acted on by a hospital, Dr. Yedidag’s counsel’s answer was, essentially, that that is not this case. But when pushed further, counsel conceded that some forms of action or conduct could be outside of the non-disclosure bar. The concern in this case, as it went to the jury, is not whether Dr. Yedidag’s particular manner of questioning was the type of conduct that would fall within or outside of the nondisclosure bar. The concern is that the jury was instructed that, as a matter of law, any disclosure of a member’s action or conduct constituted a violation of the statute simply because the action or conduct transpired during the review process. The syllogism is: The ROIA was violated if conduct that transpired during the process was disclosed. Conduct that transpired during the process was disclosed. Therefor, the ROIA was violated. This meant Eastern must be liable. The jury was given no choice but to find a violation. And it was instructed- that it could award damages upon the violation. {73} For all of the reasons discussed in this dissent, I would reverse the jury verdict. JONATHAN B. SUTIN, Judge