**Certiorari Granted, September 27, 2013, No. 34,286**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2013-NMCA-096**

**Filing Date: July 3, 2013**

**Docket No. 31,653**

**EMRE YEDIDAG, M.D.,**

> **Plaintiff-Appellee,**

**v.**

**ROSWELL CLINIC CORP., and
ROSWELL HOSPITAL CORP.,**

> **Defendants-Appellants.**

**APPEAL FROM THE DISTRICT COURT OF CHAVES COUNTY
Freddie J. Romero, District Judge**

Tucker Law Firm, P.C.
Steven L. Tucker
Santa Fe, NM

Law Office of Stephen Durkovich
Stephen G. Durkovich
Santa Fe, NM

Bauman, Dow & León
Mark C. Dow
Simone M. Seiler
Albuquerque, NM

for Appellee

Kemp Smith LLP
Ken Slavin
Clara B. Burns
Shelly W. Rivas
El Paso, TX

1

for Appellants

**OPINION**

**VANZI, Judge.**

**{1}** Plaintiff-Appellee Dr. Emre Yedidag was terminated from his position as a general surgeon by his employer Defendants-Appellants Roswell Clinic Corporation and Roswell Hospital Corporation d/b/a Eastern New Mexico Medical Center (collectively, Eastern). Dr. Yedidag's termination occurred within days after he participated in an internal hospital surgical peer review meeting that included review of surgical care provided by one of Dr. Yedidag's colleagues at Eastern. Following the peer review meeting, two Eastern employees who were present at the meeting disclosed to Eastern administrators their belief that Dr. Yedidag had engaged in unprofessional and aggressive behavior at the peer review meeting. Dr. Yedidag filed suit against Eastern following his termination, alleging that he was fired as a result of his participation in the peer review meeting. The jury determined that Eastern violated the New Mexico Review Organization Immunity Act (the ROIA), NMSA 1978, §§ 41-9-1 to -7 (1979, as amended through 2011), and breached an implied promise in Dr. Yedidag's employment agreement that he would not face adverse employment consequences as a result of his participation in the hospital's peer review process.

**{2}** Eastern's primary argument on appeal is that the district court erred in allowing Dr. Yedidag to bring a private cause of action under the ROIA. Eastern also raises arguments regarding the propriety of the implied promise contractual cause of action, the jury's award of punitive damages, the jury polling process, the admission of medical evidence at trial, and the award of attorney fees. As a matter of first impression, we hold that a member of a peer review organization can bring a private cause of action for an alleged violation of the ROIA's confidentiality provision, Section 41-9-5. We also conclude that the district court did not err with respect to Eastern's remaining arguments. Accordingly, we affirm the jury verdict.

**BACKGROUND**

**A.     The ROIA**

**{3}** Because this appeal raises issues regarding the application of the ROIA in a civil action, we turn first to provide some background on the ROIA. Enacted by the Legislature in 1979, the ROIA "establishe[s] a comprehensive scheme of regulation of hospital peer review proceedings, including the scope of immunity available to members of a review organization" and the confidentiality of the records of review organizations. *Leyba v. Renger*, 114 N.M. 686, 687, 845 P.2d 780, 781 (1992); *see also Sw. Cmty. Health Servs. v. Smith*, 107 N.M. 196, 198, 755 P.2d 40, 42 (1988) (recognizing that the "ROIA establishes a medical peer review process to promote the improvement of health care in New Mexico"). Under the ROIA, hospital review organizations are limited in membership to "health care

providers and staff, except where otherwise provided for by state or federal law," and are tasked with gathering and reviewing information relating to the care and treatment of patients for eight enumerated purposes. *See* § 41-9-2(E).

**{4}** The ROIA grants qualified immunity to members of review organizations and to individuals who provide information to review organizations. *See* § 41-9-4 (providing that members of review organizations shall not be liable "for damages or other relief in any action brought by a person or persons whose activities have been or are being scrutinized or reviewed by a review organization . . . unless the performance of such duty, function or activity was done with malice toward the person affected thereby"); *see also* § 41-9-3 (stating that "[n]o person providing information to a review organization shall be subject to any action for damages or other relief . . . unless such information is false and the person providing such information knew or had reason to believe such information was false"); *Leyba*, 114 N.M. at 687-88, 845 P.2d at 781-82 (holding that the ROIA establishes qualified immunity).

**{5}** Of particular relevance to this case is Section 41-9-5, which deals with the confidentiality of review organization meetings. Section 41-9-5(A) provides that

> all data and information acquired by a review organization in the exercise of its duties and functions shall be held in confidence and shall not be disclosed to anyone except to the extent necessary to carry out one or more of the purposes of the review organization or in a judicial appeal from the action of the review organization. *No person described in Section 41-9-4 [of the ROIA] shall disclose what transpired at a meeting of a review organization except to the extent necessary to carry out one or more of the purposes of the review organization, in a judicial appeal from the action of the review organization or when subpoenaed by the New Mexico medical board.*

(Emphasis added.) As we discuss in later sections of this Opinion, this appeal involves claims by Dr. Yedidag that Eastern employees allegedly violated Section 41-9-5 by disclosing what transpired at a peer review meeting and that, as a result of Eastern's alleged violation of the ROIA, Dr. Yedidag faced adverse employment consequences and suffered damages.

**B.      Case History**

**{6}** Dr. Yedidag began working as a general surgeon for Eastern on December 5, 2005, and was terminated from his position nearly eleven months later on November 17, 2006. Two days prior to his termination, Dr. Yedidag attended and participated in a meeting of the Surgical Performance Improvement Committee at Eastern (the peer review meeting). According to documents in the record before this Court on appeal, the meeting was attended by five physicians, including Dr. Yedidag and the colleague whose surgical care and treatment of a patient would eventually be discussed at the peer review meeting. Also

present at the meeting were four members of Eastern's administration and management staff, including Sara Williamson and Barbara Harned. During the peer review meeting, Dr. Yedidag participated in the review of his colleague's surgical care and treatment of a patient. Since the physician whose case was under review was also present at the peer review meeting, Dr. Yedidag questioned the physician regarding the surgical treatment given and the events that led to the patient's death. At the conclusion of the meeting, the peer review members requested that the case be sent for external review by a general surgeon.

{7}     Immediately after the peer review meeting ended, members of Eastern's administration and management staff who were present at the meeting, including Sara Williamson, reported to Rich Robinson, Eastern's CEO, and Michael Kueker, Dr. Yedidag's immediate supervisor, that Dr. Yedidag had engaged in unprofessional and aggressive behavior at the peer review meeting. At trial, Keuker testified that he was told that Dr. Yedidag had verbally attacked the colleague whose case was under review at the meeting, and Sara Williamson testified that she told Eastern administrators that Dr. Yedidag had engaged in extremely disruptive behavior at the peer review meeting.

{8}     The next day, Kueker met with Dr. Yedidag to suspend him from his position. On November 17, 2006, Dr. Yedidag received a letter from Eastern terminating his employment. The letter did not mention the events of the peer review meeting and instead stated that Dr. Yedidag's termination was pursuant to Paragraphs 10.1(j), 10.1(k), and 10.1(m) of Dr. Yedidag's employment agreement with Eastern and was a result of his "continued unprofessional behavior and language" and "continued disruptive behavior." These provisions of the employment agreement provided for immediate termination based upon:

> (j)     [Eastern's] determination that [Dr. Yedidag's] continued employment would pose an unreasonable risk of harm to patients or others or would adversely affect the confidence of the public in the services provided by [Eastern];

> (k)     [Eastern's] determination that [Dr. Yedidag] has engaged in gross insubordination or gross dereliction of duty;

> . . . .

> (m)     conduct by [Dr. Yedidag] which is reasonably considered by [Eastern] to be unethical, unprofessional, fraudulent, unlawful, or adverse to the interest, reputation or business of [Eastern.]

{9}     On January 24, 2007, Dr. Yedidag filed an eight-count civil complaint against Eastern seeking monetary damages and other relief as a result of his termination. An amended complaint later filed by Dr. Yedidag consisted of the following specific causes of action: fraud in the peer review process; violation of the ROIA's confidentiality provision; breach of Dr. Yedidag's employment agreement with Eastern; breach of the covenant of

4

good faith and fair dealing; retaliatory discharge; civil conspiracy; and prima facie tort. In response to Dr. Yedidag's lawsuit, Eastern took the position throughout the proceedings below that Dr. Yedidag was terminated for cause pursuant to his employment agreement with Eastern due to his unprofessional conduct.

**{10}** At trial, the claims that were submitted to the jury pertinent to disposition of this appeal were: (1) violation of the ROIA, and (2) breach of implied promises in Dr. Yedidag's employment agreement with Eastern. With regard to the ROIA claim, the jury was instructed to determine whether Eastern "breach[ed] the confidentiality requirement of [the ROIA] through its disclosure of Dr. Yedidag's actions at the . . . peer review . . . meeting by Sara Williamson to Eastern's CEO and Eastern's Physician Practice Coordinator, who were not members or participants in the . . . peer review [meeting]." As for the implied promises claims, the jury was instructed to find whether Eastern had breached three implied promises located within Dr. Yedidag's employment agreement.

**{11}** The jury returned a special verdict in favor of Dr. Yedidag, finding that (1) Eastern violated the ROIA, and (2) Eastern breached its employment agreement with Dr. Yedidag by breaching an implied promise that there would be no adverse consequences to Dr. Yedidag's employment or staff privileges as a consequence of his participation in the peer review process. The jury further determined that both of the foregoing were a proximate cause of Dr. Yedidag's damages, and it awarded Dr. Yedidag $997,814 in compensatory damages and three million dollars in punitive damages. This appeal followed. We will relate additional background as necessary to our discussion of each issue raised on appeal.

**DISCUSSION**

**{12}** Eastern raises six arguments on appeal. Eastern's primary argument is that the district court erred in allowing Dr. Yedidag to bring a private cause of action under the ROIA. Eastern also raises arguments regarding the propriety of the implied promises contractual cause of action, the jury's award of punitive damages, the jury polling process, the admission of medical evidence at trial, and the award of attorney fees. We address each argument in turn.

**1.      Private Cause of Action Under the ROIA**

**{13}** At the center of this appeal is the issue of whether a private civil cause of action can arise from violation of Section 41-9-5, the ROIA's confidentiality provision. Eastern contends that the district court improperly permitted Dr. Yedidag to bring a cause of action for damages and other relief against Eastern for an alleged violation of Section 41-9-5. The parties agree that the ROIA does not expressly provide for a private cause of action arising from violation of Section 41-9-5. In fact, we note that the only remedy expressly identified in the ROIA for Section 41-9-5 violation is criminal in nature. *See* § 41-9-6 (providing that any unauthorized disclosure of data or information acquired by a review organization or of what transpired at a review organization meeting is punishable as a petty misdemeanor).

5

However, the district court determined that a private cause of action can exist under the ROIA for violation of Section 41-9-5. Our review of the district court's ruling presents a matter of first impression for this Court.

{14} The question of whether a statute creates or implies a private cause of action is a question of law that we review de novo. *See Sedillo v. N.M. Dep't of Pub. Safety*, 2007-NMCA-002, ¶ 7, 140 N.M. 858, 149 P.3d 955. Generally speaking, there are only a handful of cases in New Mexico that have addressed the creation of a private cause of action for statutory violations where a statute does not expressly provide for such an action. *See, e.g.*, *Hovet v. Allstate Ins. Co.*, 2004-NMSC-010, ¶ 9, 135 N.M. 397, 89 P.3d 69 (determining, based on legislative intent and public policy, that third-party claimants may bring a cause of action under the Insurance Code for unfair claims practices where the statute at issue already provided for a general cause of action); *Starko, Inc. v. Presbyterian Health Plan, Inc.*, 2012-NMCA-053, ¶¶ 28, 33-42, 276 P.3d 252 (recognizing a private cause of action arising under a statutory provision of the Public Assistance Act), *cert. granted*, 2012-NMCERT-003, 293 P.3d 184; *Sedillo*, 2007-NMCA-002, ¶¶ 1, 8-17 (addressing whether the Peace Officer's Employer-Employee Relations Act provides a private cause of action); *Nat'l Trust for Historic Pres. v. City of Albuquerque*, 117 N.M. 590, 592-94, 874 P.2d 798, 800-02 (Ct. App. 1994) (recognizing a private cause of action under the New Mexico Prehistoric and Historic Sites Preservation Act and determining that the plaintiffs had standing to bring such an action).

{15} In this case, Eastern's argument involves an examination of three non-exclusive factors first enunciated by this Court in *National Trust* for determining whether a private cause of action can be implied for a statutory violation in the absence of an explicit statutory directive.[1] 117 N.M. at 593, 874 P.2d at 801. These factors are as follows: "(1) Was the

---

[1] Eastern's briefing refers to the factors identified in *National Trust* as the same as those for a cause of action based on negligence per se. At oral argument before this Court, Eastern again reiterated that the analysis is the same for a private cause of action arising for a statutory violation in the absence of an explicit statutory directive and a cause of action based on negligence per se. We disagree.

Our Supreme Court has stated that "[n]egligence per se . . . is a method of proving negligence where a cause of action already exists." *Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A.*, 106 N.M. 757, 763, 750 P.2d 118, 124 (1988). Moreover, our Supreme Court has enunciated a four-part test for determining whether a negligence per se instruction is appropriate in a given case: "(1) There must be a statute which prescribes certain actions or defines a standard of conduct, either explicitly or implicitly, (2) the defendant must violate the statute, (3) the plaintiff must be in the class of persons sought to be protected by the statute, and (4) the harm or injury to the plaintiff must generally be of the type the [L]egislature through the statute sought to prevent." *Heath v. La Mariana Apartments*, 2008-NMSC-017, ¶ 7, 143 N.M. 657, 180 P.3d 664 (alteration, internal quotation marks, and citation omitted). Eastern made no arguments to this Court on appeal based on this four-part

6

statute enacted for the special benefit of a class of which the plaintiff is a member?[;] (2) Is there any indication of legislative intent, explicit or implicit, to create or deny a private remedy?[; and] (3) Would a private remedy either frustrate or assist the underlying purpose of the legislative scheme?" *Id.* In addition, "[a] state's public policy, independent of [these] factors, may be determinative in deciding whether to recognize a cause of action." *Id.* at 594, 874 P.2d at 802. Before addressing Eastern's arguments based on these factors as well as public policy, we turn first to address two preliminary arguments advanced by Eastern.

**{16}** Eastern initially argues against the recognition of a private cause of action for a Section 41-9-5 violation due to Dr. Yedidag's failure during trial proceedings to present any case precedent that has allowed for a private cause of action under the ROIA in an employment case. However, neither party has presented this Court with case law, either from New Mexico or from another jurisdiction, that has previously addressed the precise issue before the Court: whether a state peer review immunity statute, such as the ROIA, allows a member of a review organization to bring a private cause of action for damages and other relief as a result of a violation of the statute's confidentiality provision. Thus, in the absence of authority going one way or the other on this issue, we are not compelled by Eastern's argument that we should decline to recognize a private cause of action simply because it is a matter of first impression for this Court.

**{17}** Eastern next argues that the creation of a private cause of action under the ROIA is improper because the ROIA already provides a criminal penalty. *See* § 41-9-6. In support of this argument, Eastern cites to authority from other jurisdictions that have held that courts will not generally create a private cause of action where a statute provides a penalty for violation but does not specifically provide for a private cause of action. *See, e.g.*, *Youren v. Tintic Sch. Dist.*, 2004 UT App 33, ¶ 4, 86 P.3d 771. While we acknowledge that such authority exists in other jurisdictions, these cases are not controlling, and Eastern does not point to any New Mexico authority that has adopted this reasoning. In addition, we are aware of New Mexico cases that have looked beyond the simple question of whether a statutory scheme already includes an express legal remedy in determining whether to recognize a private cause of action for a statutory violation. In resolving this question, these cases have examined the adequacy of the legal remedy already provided by the statute at issue or, alternatively, whether the legal remedy already provided for would be frustrated by

---

test and instead focused on the three non-exclusive factors set forth in *National Trust*.

　　We observe that Jury Instruction No. 7 was an instruction based on negligence per se that was submitted to the jury in this case. This instruction was submitted in addition to Jury Instruction No. 4, which directed the jury to consider whether Eastern had violated Section 41-9-5 and defined Dr. Yedidag's burden of proof in establishing this direct violation. However, as a result of our holding that a private cause of action can arise for violation of Section 41-9-5, we need not address the interplay between these two instructions and the relatively limited argument based on negligence per se that was presented by the parties on appeal.

7

the imposition of additional remedies through a private cause of action. *See Cal. First Bank v. State*, 111 N.M. 64, 74-75, 801 P.2d 646, 656-57 (1990) (determining that the administrative remedies already provided for by statute were "not of such a comprehensive nature and scope that they would be frustrated by imposition of tort liability" via a private cause of action); *see also State ex rel. Educ. Assessments Sys., Inc. v. Coop. Educ. Servs. of N.M., Inc.*, 115 N.M. 196, 200-02, 848 P.2d 1123, 1127-29 (Ct. App. 1993) (declining to recognize a private cause of action for disappointed offerors, in part, based on this Court's determination that the remedies already provided under the Procurement Code were adequate to protect the disappointed offerors). We are therefore reluctant to rest our analysis of whether a private cause of action can arise for violation of Section 41-9-5 solely on the fact that the ROIA already prescribes a criminal penalty for this violation.

**{18}** We thus turn to consider Eastern's argument against the recognition of a private cause of action based on the three non-exclusive factors set forth in *National Trust*. As we set forth in greater detail below, weighing of these factors as well as public policy leads us to conclude that a private cause of action can arise for violation of Section 41-9-5.

**{19}** We first analyze whether Dr. Yedidag is a member of a class for whose special benefit the ROIA was enacted. *See Nat'l Trust*, 117 N.M. at 593, 874 P.2d at 801 (stating that the first factor is whether the statute was enacted for the special benefit of a class of which the plaintiff is a member). In our view, one class of individuals that the Legislature clearly intended to protect by enacting the ROIA is members of a review organization—i.e., those individuals who directly participate in the peer review process. Protection of members of review organizations is achieved in two primary ways under the ROIA: (1) by providing qualified immunity to members of review organizations, and (2) by maintaining confidentiality during the peer review process by limiting discovery of data and information gathered during the peer review process as well as restricting disclosure of what transpired at meetings.[2] *See* § 41-9-4 (providing that members of review organizations shall not "be liable for damages or other relief in any action brought by a person or persons whose

---

[2] We clarify that these protections do not flow to the physician who is the target of the peer review action. Furthermore, although this issue is not before the Court in this case and we therefore do not decide it, we observe that an overwhelming majority of cases from other jurisdictions that have addressed the issue have held that the physician under review cannot bring a private cause of action against professional review bodies. *See* Scott M. Smith, *Construction and Application of Health Care Quality Improvement Act of 1986*, 121 A.L.R. Fed. 255, § 9 (1994) (citing to federal cases that have held that the Health Care Quality Improvement Act (HCQIA) does not create a right of action for a physician subject to the peer review process); *see also Hancock v. Blue Cross-Blue Shield of Kan., Inc.*, 21 F.3d 373, 374 (10th Cir. 1994) (holding that the HCQIA does not create a right of action for a physician subject to the peer review process); *Tunca v. Painter*, 980 N.E.2d 1132, 1137 (Ill. App. Ct. 2012) (holding that the state's peer review statute did not give a peer reviewed physician a private right of action).

8

activities have been or are being scrutinized or reviewed by a review organization . . . unless the performance of such duty, function or activity was done with malice toward the person affected thereby"); *see also* § 41-9-5(A) (providing that no member of a review organization "shall disclose what transpired at a meeting of a review organization except to the extent necessary to carry out one or more of the purposes of the review organization, in a judicial appeal from the action of the review organization or when subpoenaed by the New Mexico medical board"). Our determination that the ROIA was enacted, in part, to protect peer review participants is comparable to other cases that have similarly noted that these statutes were designed to protect those who engage in the peer review process as participants. *See, e.g.*, *Goldsmith v. Harding Hosp., Inc.*, 762 F. Supp. 187, 188 (S.D. Ohio 1991) (stating that the chief beneficiaries of the HCQIA are the professional review bodies that are accorded immunity from liability for damages); *Cooper v. Del. Valley Med. Ctr.*, 654 A.2d 547, 554 (Pa. 1995) (reiterating that the legislature's clear purpose in enacting that state's peer review statute was to protect peer review participants). Since it is undisputed that Dr. Yedidag was a member of a review organization as defined in the ROIA, we conclude that he is a member of a class that the ROIA was enacted to specially benefit.

{20}     Next, we consider whether there is any indication of legislative intent, either explicit or implicit in the ROIA, to create or deny a private remedy to Dr. Yedidag. *See Nat'l Trust*, 117 N.M. at 593, 874 P.2d at 801. As we stated earlier, one indication that the Legislature did not intend to permit private remedies for violation of Section 41-9-5 is the fact that the ROIA expressly provides a criminal penalty for violation of this provision. *See* § 41-9-6. However, there is no indication in the language of Section 41-9-6 that the criminal penalty—although mandatory in nature—was intended to be the exclusive remedy for violation of the ROIA's confidentiality provision.[3] Without undermining the Legislature's judgment that the criminal penalty protects against unauthorized disclosures of what transpired at a review organization meeting, we are unable to conclude that there is any explicit or implicit language in the ROIA that the Legislature intended to deny private remedies for peer review participants who face adverse employment consequences as a direct result of their participation in the process. Eastern also argues that there is no indication of legislative intent to create a private remedy under the ROIA because the ROIA

_____

[3] Although the criminal penalty is a compelling signal of legislative intent, other provisions of the ROIA signal that the Legislature did not implicitly intend to foreclose the possibility of private remedies for other types of ROIA violations. Because the immunity provided under the ROIA is qualified in nature, a number of ROIA provisions contemplate legal action that is non-criminal in nature, thereby serving as one signal that the Legislature intended to allow for other remedies. *See* § 41-9-4 (stating that members of peer review organizations who perform their duties with malice toward the scrutinized physician can be held liable for "damages or other relief in any action brought by [the scrutinized physician]"); *see also* § 41-9-3 (providing that individuals who knowingly provide false information to a review organization "shall be subject to any action for damages or other relief").

9

was "created to improve health care in New Mexico and as such, it has an aggregate focus, not an individual focus." *See Starko*, 2012-NMCA-053, ¶ 35 (relying on United States Supreme Court case law that evaluates legislative intent to create a private remedy by examining, among other factors, whether the statute has an "aggregate, not individual, focus" (internal quotation marks and citation omitted)). We disagree. The protections afforded under the ROIA to peer review participants are individual in nature and promote the aggregate integral purpose of the statute—the improvement of health care in New Mexico and protection of the general public—by ensuring effective professional peer review through a candid, frank, and critical evaluative process. *See Sw. Cmty. Health Servs.*, 107 N.M. at 198, 755 P.2d at 42 (stating that the ROIA "recognizes that candor and objectivity in the critical evaluation of medical professionals by medical professionals is necessary for the efficacy of the review process").

**{21}** Turning to the third factor, we conclude that a private remedy for a violation of Section 41-9-5 will not frustrate the underlying purposes of the ROIA. *See Nat'l Trust*, 117 N.M. at 593, 874 P.2d at 801 (stating that the third factor is an examination of whether a private remedy will either frustrate or assist the underlying purpose of the legislative scheme). As we have noted, the overall purpose of the ROIA, which is to promote the improvement of health care in New Mexico, is furthered through the protections afforded under the ROIA to members of review organizations. *See Sw. Cmty. Health Servs.*, 107 N.M. at 198, 755 P.2d at 42; *see also Leyba*, 114 N.M. at 689, 845 P.2d at 783 (emphasizing that the ROIA "reflects a reasoned balance between the competing needs of the public for frank and accurate review of a physician's qualifications and the needs of physicians being credentialed for a fair and impartial review process"). Specifically, the confidentiality provision of the ROIA, and chiefly Section 41-9-5, serve to ensure an effective peer review process by promoting participation in the process by physicians and other medical professionals. This provision offers security to members that, assuming they are acting to carry out one or more of the purposes of the review organization, they will not suffer personal or professional harm as a result of their participation in, or based on the data and information shared in the process or the communications made during the process. If members of review organizations are subject to adverse employment consequences as a result of their participation in the peer review process, there will be a chilling effect on future participation by medical professionals in the process. Such a result is clearly contrary to what the Legislature intended when it enacted the ROIA. Allowing a private remedy for a violation of Section 41-9-5 would not frustrate the underlying purposes of the ROIA.

**{22}** In arguing that the ROIA should not be interpreted under the *National Trust* factors to provide for a private right of action, the dissent expresses concern regarding the reach of our holding. In particular, the dissent raises doubt that the Legislature intended to absolutely immunize from discipline all conduct by a member of a review organization during the peer review process and goes on further to point to a number of hypothetical scenarios during a peer review meeting that it maintains should not be protected from disclosure. However, as the dissent acknowledges, the language of Section 41-9-5(A) prohibits the disclosure of what transpired at a meeting of a review organization "except to the extent necessary to carry out

one or more of the purposes of a review organization." Thus, the disclosure provision is not absolute in nature, and our holding assumes that a member of a review organization was acting to carry out one or more purposes of the review organization.

**{23}** Based on the foregoing, we conclude that a private cause of action can arise for violation of Section 41-9-5 and, therefore, the district court did not err in submitting this cause of action to the jury.

## 2.      Breach of Implied Promise

**{24}** Eastern argues that the district court erred in allowing Dr. Yedidag to submit a claim to the jury that Eastern violated Dr. Yedidag's employment agreement by breaching an implied promise within the agreement that Dr. Yedidag would not suffer adverse employment consequences as a result of his participation in the peer review process. The jury determined that Eastern breached this implied promise. As we understand its argument, Eastern contends that the claim should not have been submitted to the jury because Dr. Yedidag's employment agreement controlled the manner and methods by which he could be terminated, and the implied promise improperly contradicted the express terms of the agreement.

**{25}** We are not persuaded. Eastern appears to argue that the implied promise contradicts the express termination provisions in the employment agreement because it precluded Eastern from considering Dr. Yedidag's conduct during the peer review meeting as a basis for termination. Eastern states that implied promises cannot contradict the express terms of a contract; however, we are not convinced that the implied promise that Eastern takes issue with actually contradicts the express terms of Dr. Yedidag's employment agreement. The jury found that Eastern breached an implied promise that Dr. Yedidag would not suffer adverse consequences to his employment or staff privileges as a result of his *participation* in the peer review process. There is nothing in the language in this particular implied promise, as submitted to the jury on the special verdict form, that the implied promise was meant to encompass conduct in addition to Dr. Yedidag's participation in the peer review process. The district court did not prevent Eastern from arguing throughout trial that it terminated Dr. Yedidag as a result of what Eastern considered to be unprofessional conduct during the peer review process. There is no dispute that Eastern was able to present evidence and argument at trial as to its interpretation of the employment agreement as well as its view of the implied promise raised by Dr. Yedidag as a basis for termination. We conclude that there was no error.

## 3.      Award of Punitive Damages

**{26}** Eastern challenges the jury's award of punitive damages on two grounds, arguing that (1) there was insufficient evidence to support the award, and (2) the award violates due process.

11

**{27}** We first consider Eastern's argument that the punitive damages award was not supported by sufficient evidence. Punitive damages are awarded for the purposes of punishing wrongdoing and deterring both the wrongdoer and others from the commission of similar offenses. *Madrid v. Marquez*, 2001-NMCA-087, ¶ 4, 131 N.M. 132, 33 P.3d 683. In order to support an award, there must be some evidence of a culpable mental state on the part of Eastern. In this case, the jury was instructed that it could award punitive damages against Eastern if it found that "the conduct of Rich Robinson, Sara Williamson, Michael Keuker, or Barbara Harned was malicious, willful, reckless, wanton, fraudulent or in bad faith[.]" On appeal, Eastern contends that the punitive damages award was not supported by sufficient evidence because Eastern terminated Dr. Yedidag after consulting with legal counsel and because the law was unsettled as to whether the ROIA protected Dr. Yedidag from facing adverse employment consequences as a result of the peer review process. Eastern argues that this case is similar to *Lujan v. Pendaries Properties, Inc.*, 96 N.M. 771, 775, 635 P.2d 580, 584 (1981), a case where the Supreme Court reversed an award of punitive damages because the defendant had acted on the advice of counsel and because he had taken a legal position that was not without some justification. However, our review of *Lujan* indicates that this was not the sole basis for the Supreme Court's decision to vacate the punitive damages award. Significantly, the Court there also considered the other evidence cited in support of the district court's award of punitive damages and found that this evidence was insufficient to show that the defendant had acted with a culpable mental state. *Id.* Thus, we disagree with Eastern that *Lujan* stands for the proposition that an award for punitive damages may be vacated solely because the defendant acted based on the advice of counsel. Rather, it is one fact that may be considered, amongst others, in determining whether there was sufficient evidence to support an award of punitive damages.

**{28}** Aside from citing to testimony from an Eastern administrator that he terminated Dr. Yedidag after consulting with legal counsel, Eastern fails to show why the jury could not have reasonably inferred from the other evidence presented at trial that Eastern acted maliciously, willfully, recklessly, wantonly, fraudulently, or in bad faith. As a result of Eastern's failure to sufficiently develop its argument and present the facts necessary for our review of its sufficiency challenge, we do not consider its argument any further. *See Martinez v. Sw. Landfills, Inc.*, 115 N.M. 181, 186, 848 P.2d 1108, 1113 (Ct. App. 1993) (stating that the appellate court will not consider an insufficiency of evidence argument without presentation of the evidence as a whole or based only on facts that tend to support the argument).

**{29}** We next consider Eastern's argument that the punitive damages award violates due process. Whether an award of punitive damages comports with constitutional due process is a question of law that we review de novo. *Aken v. Plains Elec. Generation & Transmission Coop., Inc.*, 2002-NMSC-021, ¶ 19, 132 N.M. 401, 49 P.3d 662. Following *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996), our review takes three criteria into account: "[(1)] the degree of reprehensibility of the defendant's misconduct[, (2)] the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive damages award[,] and [(3)] the difference between the punitive damages awarded

12

by the jury and the civil penalties authorized or imposed in comparable cases." *Aken*, 2002-NMSC-021, ¶ 20. Eastern makes no argument as to the first and third *BMW of North America* factors and instead makes a cursory argument as to the second factor. It contends that the amount of the punitive damages award was so unrelated to the injury as to "plainly manifest passion and prejudice rather than reason or justice[,]" *Aken*, 2002-NMSC-021, ¶ 23 (internal quotation marks and citation omitted), because: (1) the award was not based on a bad faith breach of Dr. Yedidag's employment agreement, and (2) the award was based on the ROIA claim that does not exist. We disagree. As we have already determined, the ROIA claim was validly submitted to the jury and therefore could have served as a basis for the award of punitive damages. And although the jury found that Eastern did not violate a duty of good faith and fair dealing implied in Dr. Yedidag's employment agreement, Eastern fails to explain why the jury nevertheless could not have found that Eastern acted in bad faith. Nor does Eastern explain why the jury's award of punitive damages could not have been based on malicious, willful, or reckless conduct as those terms were defined in the jury instruction on punitive damages. Finally, like its approach to the other arguments it raised on appeal, Eastern's briefing failed to otherwise undertake any traditional analysis of the second *BMW of North America* factor that would permit meaningful review of the constitutional muster of the punitive damages award. *See* 517 U.S. at 560. We therefore conclude that there is no basis to reverse the award of punitive damages on constitutional due process grounds.

### 4. Jury Polling

**{30}** Eastern argues that the district court committed reversible error by sending the jury back to the jury room for further deliberations on the proximate cause question tied to Dr. Yedidag's breach of contract claim as a result of the colloquy between the district court and the jury during the course of polling. Eastern contends that the district court's actions were coercive and constituted impermissible "verdict-urging."

**{31}** To provide context, we first provide the relevant portion of the special verdict form as well as the colloquy between the district court and the jury during polling. With regard to Dr. Yedidag's breach of contract claim, the special verdict read as follows:

> 3. Did Eastern breach its employment contract with Dr. Yedidag?
> _____ YES     _____ NO
>
> 3A. If you have answered Yes to this Question, please indicate by a check in the appropriate blank the violation found.
>
> > _____ Eastern breached its implied promise that there would be no adverse consequences to Dr. Yedidag's employment or staff privileges as a consequence of his participation in the peer review process.

13

_____ Eastern violated its duty of good faith and fair dealing . . . .

_____ Eastern's discharge of Dr. Yedidag for being a disruptive employee did not conform . . . .

3B.　　Also put Yes in each appropriate blank if you found that any violation checked above if that violation was a proximate cause of Dr. Yedidag's damages.

After the jury concluded its deliberations and returned to the courtroom with its verdict, the district court proceeded to review the completed special verdict form. With regard to the above questions, the district court stated that the jury had answered "Yes" to Question 3 and had placed a check mark in the blank for the first violation listed under Question 3A. The court then stated that in response to Question 3B, the jury had not placed a "Yes" next to the check mark. The following specific exchange occurred between the court and the jury foreperson regarding Question 3B:

THE COURT:　　　　　[Question] 3B indicated [to] put [Y]es in each appropriate blank if you found that any violation checked above . . . was a proximate cause of Dr. Yedidag's damages[. T]here is no [Y]es next to the subsection.

THE FOREPERSON:　　Did we forget something?

THE COURT:　　　　　Do you want to go back in—

THE FOREPERSON:　　I think the way we have it is the way we wanted it.

The court then continued to read the jury's answers on the remainder of the special verdict form. Thus, the initial answers on the special verdict form indicated that the jury did not find that Eastern's violation of the implied promise was a proximate cause of Dr. Yedidag's damages.

**{32}**　At Eastern's request, the district court then proceeded to poll the jury, during which the following colloquy occurred regarding Question 3B:

THE COURT:　　　　[T]he next question was also put [Y]es in each appropriate blank if you found that any violation checked above, if that violation was a proximate cause of Dr. Yedidag's damages. With regard to the one [violation] that you checked, there is no [Y]es next to it, was that your decision?

14

THE CLERK: [Juror] 74?

[JUROR 74]: Yes, I guess. I'm lost again.

THE COURT: Maybe what we should do is have the jury go back in to consider that one question. And, ladies and gentleman, you have found—at least five of you have checked off this bottom one. You need to next answer if you feel that was a proximate cause of damages[,] you need to write [Y]es next to it[;] if you don't, leave it—don't put yes next to it. Okay. So we'll send the jury back in. . . .

. . . .

[Eastern]: Before we did do that, . . . could [we] object to sending them back[?] . . . .

THE COURT: Let me just state that the jury was requested to be polled. We were polling the jury, the jury expressed confusion with regard to that question. I have asked them and I believe instructed them correctly as to if they intended [Y]es[,] they needed to put it, if they didn't, they didn't. They're simply going to clarify for purposes of polling so the objection is overruled.

When the jury returned from the jury room, the special verdict form included a "Yes" in answer to Question 3B next to the checked violation of an implied promise. The district court re-polled the jury on Question 3B, and all six jurors indicated their assent to the answer to Question 3B.

**{33}** Eastern argues on appeal that the district court improperly overruled its objection. We disagree. The district court did not err in permitting the jury to return to the jury room for further deliberations with regard to Question 3B. As this Court stated in *Sanchez v. Martinez*, 99 N.M. 66, 73, 653 P.2d 897, 904 (Ct. App. 1982), "[f]undamental justice requires that a verdict returned by a jury be certain as to its import, and be free from ambiguity or inconsistency." "The object of a poll is to give each juror an opportunity, before the verdict is recorded, to declare in open court his assent to the verdict which the foreman has returned and thus to enable the court and the parties to ascertain for a certainty that each of the jurors approves of the verdict as returned." *State v. Holloway*, 106 N.M. 161, 164, 740 P.2d 711, 714 (Ct. App. 1987) (internal quotation marks and citation omitted); *see* 75B Am. Jur. 2d *Trial* § 1523 (observing that "[t]he jury poll is the primary device for uncovering the doubt or confusion of individual jurors"). Here, the response given by Juror 74 during the polling of Question 3B indicated that the juror was uncertain or confused as to

15

his/her answer to that question. Under these circumstances, it was not improper for the district court to send the jury back for further deliberations. *See Holloway*, 106 N.M. at 165, 740 P.2d at 715 (indicating that "[t]he trial court . . . has discretion respecting the proper remedial measures which should be taken when polling reveals that a juror's verdict is uncertain or qualified[,] . . . [including] directing the jury to retire to continue its deliberations"); *see also* Rule 1-038(F) NMRA (providing that in civil cases, "[e]ither party may require the jury to be polled, which is done by the court or clerk, asking each juror if it is the juror's verdict; if upon such inquiry or polling, more than one of the jurors disagree thereto, the jury must be sent out again" for further deliberations).

**{34}** Eastern also contends that the district court's statements to the jury during polling were coercive and that the court urged the jury during polling to change its answer to Question 3B. Our review of the polling indicates that the district court's statements to the jury regarding Question 3B were neutral in form and substance. To the extent that Eastern takes issue with the fact that the jury changed the special verdict form and answered "Yes" to Question 3B during the additional deliberations, the general rule is that there is no final verdict until the jury has been discharged. *See Hurst v. Citadel, Ltd.*, 111 N.M. 566, 570, 807 P.2d 750, 754 (Ct. App. 1991). Because the jury was not discharged in this case until after further deliberations were completed, the jury was permitted to change the form and substance of its verdict to coincide with its intention during the course of those additional deliberations. We conclude that there is no basis for reversal on this issue.

## 5. Admission of Medical Evidence

**{35}** Eastern summarily argues that the district court erred in admitting evidence in the form of medical records and physician testimony concerning the medical case that was the subject matter of the peer review meeting. We review the admission of evidence for an abuse of discretion. *See Nelson v. Homier Distrib. Co.*, 2009-NMCA-125, ¶ 29, 147 N.M. 318, 222 P.3d 690. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case." *Wilde v. Westland Dev. Co.*, 2010-NMCA-085, ¶ 30, 148 N.M. 627, 241 P.3d 628 (internal quotation marks and citation omitted).

**{36}** Eastern's argument is limited in length and scope; in the span of a few sentences, Eastern broadly argues that the evidence was improperly admitted because it was unduly prejudicial and that it "likely influenced the jury." Although Eastern provides record citations for the evidence it alleges was improperly admitted, Eastern fails to give a detailed description of the evidence and fails to explain, with appropriate supporting authority, why the district court's relevancy determinations regarding the evidence were incorrect. Eastern's undeveloped argument precludes meaningful appellate review of its relevancy argument. *See Headley v. Morgan Mgmt. Corp.*, 2005-NMCA-045, ¶ 15, 137 N.M. 339, 110 P.3d 1076 (stating that this Court "will not review unclear arguments, or guess at what [a party's] arguments might be").

16

**{37}** To the extent that Eastern contends the evidence was unduly prejudicial, we are again unpersuaded due to Eastern's failure to adequately develop this argument. Eastern provides no explanation as to why the evidence was unduly prejudicial and fails to cite to any supporting authority. We also observe that Eastern's briefing ignores the fact that the district court issued, at Eastern's request, a limiting instruction to the jury regarding the use of the medical evidence at trial. We assume that the jury followed the court's instruction absent evidence to the contrary. *See Norwest Bank N.M., N.A. v. Chrysler Corp.*, 1999-NMCA-070, ¶ 40, 127 N.M. 397, 981 P.2d 1215 (recognizing that the jury is presumed to follow the court's instruction). Eastern did not object to the content of the limiting instruction when it was given at trial, and on appeal, Eastern makes no argument as to why the limiting instruction was not adequate to overcome the prejudice that it contends allegedly resulted from the admission of the evidence. Thus, we affirm the district court's ruling regarding the admission of the medical evidence.

## 6. Attorney Fees

**{38}** Eastern's final argument on appeal challenges the district court's award of attorney fees to Dr. Yedidag. We review an award of attorney fees for an abuse of discretion. *See N.M. Right to Choose/NARAL v. Johnson*, 1999-NMSC-028, ¶ 6, 127 N.M. 654, 986 P.2d 450. However, we review the application of the law to the facts de novo. *Id.* ¶ 7. New Mexico follows the American rule regarding attorney fees, which is that, absent statutory authority, court rule, or contractual provision, litigants are responsible for their own attorney fees. *Id.* ¶ 9. In this case, the award of attorney fees was based on a contractual provision in Dr. Yedidag's employment agreement with Eastern, which provided that "[i]n the event that either party resorts to legal action to enforce the terms and provisions of this [a]greement, the prevailing party shall be entitled to recover the costs of such action so incurred, including, without limitation, reasonable attorney[] fees and applicable court costs."

**{39}** On appeal, Eastern contends that the award of attorney fees based on this provision was erroneous because the jury found that Eastern breached an implied promise in the employment agreement, which Eastern argues is a legally invalid claim. Eastern reiterates its earlier argument that the implied promise contractual claim cannot legally exist because it contradicts the express written termination provisions of the employment agreement. However, we have already rejected Eastern's argument that the implied promise claim was legally invalid. *See* Opinion at ¶ 24. Since Eastern offers no additional rationale as to why the award of attorney fees was improper, we have no other basis upon which to consider this argument further. We therefore affirm the award of attorney fees.

## CONCLUSION

**{40}** We hold that a member of a review organization can bring a private cause of action arising from an alleged violation of Section 41-9-5 of the ROIA. We affirm the jury verdict.

**{41}    IT IS SO ORDERED.**

_____
**LINDA M. VANZI, Judge**

**I CONCUR:**

_____
**M. MONICA ZAMORA, Judge**

**JONATHAN B. SUTIN, Judge (dissenting)**

**SUTIN, Judge (dissenting).**

**{42}**    I respectfully dissent.  Dr. Yedidag's private right of action and implied promise claims should have been dismissed.

**{43}**    Paragraph 2 of the employment agreement entitled "Establishment of Professional Relationship" required Dr. Yedidag to "render professional medical services and such reasonable administrative and management services as may be delegated to [him] . . . in accordance with all of the terms and conditions of [the a]greement."  Dr. Yedidag was also required to "devote full time and attention, with [his] best endeavors and skill for the interest, benefit[,] and best advantage of [Eastern]."  Paragraph 5.1(d) of the employment agreement imposed upon Dr. Yedidag the duties of "providing professional medical services and conducting professional duties in accordance with applicable law and with the current medical standards in the community[.]"  Paragraph 10.1 of the Agreement sets out fifteen separate events the occurrence of which permitted Eastern to terminate the employment agreement.  Among the events were:

> (j)    [Eastern's] determination that [Dr. Yedidag's] continued employment would pose an unreasonable risk of harm to patients or others or would adversely affect the confidence of the public in the services provided by [Eastern];

> (k)    [Eastern's] determination that [Dr. Yedidag] has engaged in gross insubordination or gross dereliction of duty;

> . . .

> (m)    conduct by [Dr. Yedidag] which is reasonably considered by [Eastern] to be unethical, unprofessional, . . . or adverse to the interest, reputation[,] or business of [Eastern.]

The employment agreement and thus Dr. Yedidag's employment were terminated pursuant

18

to Paragraphs 10.1(j), (k), and (m) of the agreement.

**{44}** Eastern's termination letter addressed to Dr. Yedidag stated:

> As you recall, at a meeting on August 3, 2006, you were advised that the behaviors you exhibit with employees, Hospital administration, and other members of the Hospital's [m]edical [s]taff must cease, including, but not limited to, your continued unprofessional behavior and language. We outlined these issues in a letter to you dated August 4, 2006. In the meeting, and again in the letter, we cautioned that failure to comply would result in immediate suspension and possible termination of the employment agreement. Your continued disruptive behavior violates the provisions set forth above, indicates you cannot or will not conform your behavior, and leads us to conclude that termination of your employment is the only practical remedy.

Paragraph 10.2 of the employment agreement states that "if either party fails to perform or commits a material breach of any provision in this [a]greement . . . then the other party thereafter may immediately terminate this [a]greement[.]" Paragraph 10.3 extends to the parties "any other rights and remedies that the parties may have at law or in equity." Paragraph 20 entitles the prevailing party in an action to enforce the employment agreement to reasonable attorney fees.

**{45}** Several aspects of Dr. Yedidag's case and briefs show that this case was nothing more than a breach of employment contract case. He could have sued on the basis that insufficient grounds existed to support termination of the agreement. In such an action, he could have attempted, for example, to show that the termination was based on specious or clearly insubstantial grounds or that relying on the peer review conduct was purely pretextual or a ruse or hidden agenda to complete a decision already made to terminate, perhaps even with malicious motive.

**{46}** Noteworthy in that regard is Dr. Yedidag's answer brief statement: "Eastern's discharge of Dr. Yedidag for unprofessional conduct was *in violation of the express terms of its agreement* with [him], whether or not that agreement also implied that he could not be discharged for peer review participation." (Emphasis added.) Dr. Yedidag argues that "[the] *breach* empower[ed] others than Dr. Ali . . . to *use the peer review meetings to harm*" Dr. Yedidag. (Emphasis added.) In an entire section of his answer brief, Dr. Yedidag takes the position that the discharge violated not only alleged implied terms, but also the express terms of the employment agreement. Dr. Yedidag also takes the position that the implied promise he asserts constitutes an exception to the express provision of Paragraph 10.1(m) of the employment agreement, which provides that grounds for termination include unprofessional conduct or conduct adverse to the interest, reputation, or business of Eastern. And Dr. Yedidag consistently implies that Eastern's motives were improper, including that it had a financial stake in the outcome of a review committee proceeding. These comments indicate

19

that Dr. Yedidag's claim presented to the jury could and should have been that Eastern breached the agreement because Eastern lacked a justifiable basis on which to terminate the agreement under Paragraph 10.1 of the agreement.

**{47}** Thus, the action that should have been pursued by Dr. Yedidag but was not pursued was a common law action based on breach of the agreement for failure to justifiably or lawfully terminate the agreement under Paragraph 10.1. New Mexico cases reflect actions for breach of an employment agreement. *See, e.g.*, *Garcia v. Middle Rio Grande Conservancy Dist.*, 1996-NMSC-029, ¶¶ 1, 19, 21, 121 N.M. 728, 918 P.2d 7 (reversing summary judgment in favor of an employer and remanding the case to allow the employee to pursue his breach of employment contract claim based on the existence of a written employment contract); *Danzer v. Prof'l Insurors, Inc.*, 101 N.M. 178, 180, 679 P.2d 1276, 1278 (1984) (reviewing a challenge to the amount of damages awarded to an employee for an employer's breach of their employment agreement); *cf.* UJI 13-2306 NMRA (stating that if the employer agreed that the employee could be discharged only for cause, the employer could discharge the employee without violating the agreement if the employer in fact had a sufficient cause to justify the discharge of the employee and that belief was reasonable). And cases reflect actions for wrongful discharge, alleging an implied contract based in part on an employee handbook. *See, e.g.*, *Hudson v. Vill. Inn Pancake House of Albuquerque, Inc.*, 2001-NMCA-104, ¶ 4, 131 N.M. 308, 35 P.3d 313; *cf.* UJI 13-2302 NMRA (discussing that wrongful discharge can be considered when an employee claims an implied agreement that he or she could be discharged only for cause). Perhaps Dr. Yedidag should not have dropped his claim for retaliatory discharge. *See* UJI 13-2304 NMRA (containing the instruction for retaliatory discharge). Notably, Dr. Yedidag did seek recovery for common law breach of contract on the limited basis of Eastern's alleged failure to follow "the procedural requirements guaranteed under the medical staff by-laws to being designated a disruptive employee" by not providing for any appeal process as to such designation. The jury expressly rejected that claim.

**{48}** It appears that Dr. Yedidag consciously chose to take the private right of action and implied promise approaches so as not to have to litigate the factual basis for Eastern's termination of the employment agreement under the express termination provision in Paragraph 10.1. As indicated earlier in this dissenting opinion, approximately three months before the peer review process took place, Eastern had advised Dr. Yedidag that the behaviors he exhibited with hospital employees, administration, and other members of the medical staff "must cease, including but not limited to, [his] continued unprofessional behavior and language." Dr. Yedidag was also "cautioned that failure to comply would result in immediate suspension and possible termination[.]" After the peer review meeting involving Dr. Ali, Eastern terminated the agreement with Dr. Yedidag.

**No Implied Statutory Right to Sue or Implied Promise Exists**

**{49}** "The ROIA establishes a medical peer review process to promote the improvement of health care in New Mexico. Further, it recognizes that candor and objectivity in the

critical evaluation of medical professionals by medical professionals is necessary for the efficacy of the review process." *Sw. Cmty. Health Servs.*, 107 N.M. at 198, 755 P.2d at 42. To effectuate that process, the ROIA provides immunity from damages for the medical professionals who participate as members of a peer review committee so that they are not discouraged from "participating in effective professional peer review." *Summers v. Ardent Health Servs., L.L.C.*, 2011-NMSC-017, ¶ 13, 150 N.M. 123, 257 P.3d 943 (discussing the policy of utilizing professional peer review actions to assure quality health care under ROIA and the Health Care Quality Improvement Act, 42 U.S.C. §§ 11101-11152 (1986)) (internal quotation marks and citation omitted) ; *see* NMSA 1978, §§ 41-9-3, -4 (1979).

**{50}**    Section 41-9-3 limits the liability of persons providing information to the review organization, and under Section 41-9-4 liability of members of the review organization is limited.  For our purposes here, a "review organization" is defined as "an organization whose membership is limited to health care providers and staff . . . and which is established by a health care provider which is a hospital . . . to gather and review information relating to the care and treatment of patients for [various] purposes[.]"  Section 41-9-2(E).  Among the eight enumerated purposes of the peer review process are "(1) evaluating and improving the quality of health care services rendered in the area or by a health care provider; (2) reducing morbidity or mortality; . . . [and] (8) determining whether a health care provider shall be granted authority to provide health care services using the health care provider's facilities or whether a health care provider's privileges should be limited, suspended[,] or revoked." Section 41-9-2(E)(1), (2), (8).

**{51}**    Dr. Yedidag characterizes the circumstances of the termination of the employment agreement as follows:  "Dr. Yedidag was discharged for persistently questioning Dr. . . . Ali . . . during a peer review meeting about a botched surgical procedure in which Dr. Ali missed one of two tumors he had attempted to remove [from a patient's] colon" and about a second surgical procedure performed by Dr. Ali that resulted in the patient's death.  I refer generally to the particular subject of the peer review process as a "target" of the process.  In this case, the obvious target of the peer review meeting was Dr. Ali.

**{52}**    Section 41-9-4 would be the immunity focus were Dr. Ali to have sued Dr. Yedidag. The doctor-member's involvement in the peer review process and the target's activities are what Section 41-9-4 addresses in terms of limitation of the doctor-member's liability.  It is noteworthy that the doctor-member has only qualified, not absolute, immunity. *Leyba*, 114 N.M. at 687, 845 P.2d at 781.

**{53}**    Here, however, we have Dr. Yedidag suing his employer for violating Section 41-9-5 of the ROIA.  Section 41-9-5(A) states that "all data and information acquired by a review organization in the exercise of its duties and functions shall be held in confidence and shall not be disclosed to anyone except to the extent necessary to carry out one or more of the purposes of the review organization[.]"  It further prohibits those persons who are protected in Section 41-9-4 from "disclos[ing] what transpired at [the] meeting . . . except to the extent necessary to carry out one or more of the purposes of the review organization[.]"  Section

21

41-9-5(A).  I read the confidentiality and disclosure provisions in Section 41-9-5 to exist primarily to protect a target because the target is precluded under Section 41-9-4 from suing those protected under Section 41-9-5.  The protection consists of the threat of criminal prosecution under Section 41-9-6 against any person who improperly discloses data or information acquired in the process that could harm the target.

**{54}**     I acknowledge that Section 41-9-5 appears to be broad enough to cover the improper disclosure of data and information acquired by the review organization that have the potential of harming persons other than the target.  Nevertheless, no New Mexico case has addressed that question, and Dr. Yedidag's attempt to support the breadth of the disclosure provision with any case law fails.  Dr. Yedidag cites one case, *Fox v. Kramer*, 994 P.2d 343 (Cal. 2000), for the proposition that he is protected.  *Fox* does not assist Dr. Yedidag in any regard.

**{55}**     *Fox* involved discovery in a civil malpractice action of a health department expert who reviewed confidential hospital peer review materials.  *Id*. at 345, 348.  The malpractice action had been filed by an injured patient against the target of the peer review process.  *Id.* at 345-46.  The California Supreme Court, in discussing the pertinent statute, stated that one of its purposes was "to protect physicians who participate in peer review from the burden of discovery and court appearances in malpractice actions against their peers; such purpose is inapplicable when a physician is willing to testify voluntarily."  *Id.* at 348.  *Fox* simply protects a physician who participates in peer review from discovery and involuntary testimony in a malpractice action against the target of a peer review process.  *Fox* in no way protects the participating physician from disciplinary action by a hospital-employer based on information received by the hospital of that physician's improper, unprofessional conduct during the process.

**{56}**     The ROIA should not be interpreted under the *National Trust* factors to provide for a private right of action for violation of the disclosure provision.  *See Nat'l Trust*, 117 N.M. at 593, 874 P.2d at 801.  Assuming that Section 41-9-5 was intended to protect a class that includes a doctor-member of a peer review board for some purposes, the class being protected in the statute should not be read to include a doctor at risk for being disciplined by the hospital for unprofessional conduct.  No part of the statute governs personnel matters, including discipline for unprofessional conduct.  If the Legislature intended the statute to relate to personnel matters, it would have said so.  Nothing in the statute evidences a legislative intent, expressly or implicitly, to create in the doctor-member of a peer review board a private right of action or remedy based on Eastern's disciplinary action taken under the express provisions of the employment agreement.  If the Legislature intended to create such right or remedy, it would have said so.  The Legislature instead provided for criminal sanction.

**{57}**     Further, the term "transpired" as it is used in Section 41-9-5 cannot be read to prohibit the disclosure of contractually prohibited unprofessional conduct of doctor-members of a peer review board during a meeting.  In addition, to the extent that the Legislature

22

intended to prohibit the disclosure of anything beyond data and information, it cannot have intended "transpired" to provide absolute immunity from discipline for unprofessional conduct of a participating doctor-member, who, as an employee of the hospital, could be fired for such conduct under an employment agreement. Yet absolute immunity from discipline is what the district court created. By interpreting "transpired" as covering anything Dr. Yedidag said or did, the district court established as a matter of law *absolute* immunity for him from termination under the employment agreement or, for that matter, from any sort of further disciplinary warnings for any conduct during the process. Oddly, under the district court's interpretation, Dr. Yedidag has absolute immunity from such adverse employment action (which, hereafter, for simplicity, I refer to as "discipline"), but only qualified immunity from suit by the target.

**{58}** "Transpired" must be interpreted in the context of the statute as a whole. Nothing in the context of the entire statute reasonably or rationally permits an interpretation of that term to mean unprofessional conduct of a doctor for which the doctor could and should be disciplined were the conduct to have occurred outside of the meeting. One can easily think of conduct that in no way could reasonably or justifiably be considered protected such that disclosure of it solely for discipline purposes would be subject to criminal prosecution.

**{59}** For example, one has to seriously doubt that the Legislature intended to grant immunity to Dr. Yedidag from discipline were he to have persistently examined Dr. Ali with brow-beating nastiness, venomous profanity, or ethnic slurs. What if Dr. Yedidag examined a target stating that the target was a *&@**!!$ quack and a no-good ignorant liar that killed the patient and deserved to go to jail or have his knees broken or worse, even were that stated as his opinion? One has to seriously doubt that the Legislature intended to absolutely immunize from discipline a doctor-member's drugged or inebriated state, or words or conduct that come within the proscriptions against discrimination based on race, religion, sex, ethnicity, etc. And one must seriously doubt that the Legislature would intend that sort of conduct to fit within the idea of the acquisition of data and information to carry out the purposes of the review organization.

**{60}** It goes without saying that Eastern has an obligation to protect the public as well as its own staff from doctors who engage in unprofessional conduct. This obligation should supercede any notion that the hospital should refrain from discipline so as not to "chill" a doctor's participation in the peer review process where the conduct in question is unacceptable and subject to discipline. The peer review process cannot be so sacrosanct as to forbid discipline for unprofessional conduct. The district court's ruling meant that *nothing* a doctor-member does or says during a meeting, no matter what, can be disclosed for discipline purposes. Under that ruling, no discipline could occur even if the conduct was such that it would adversely affect medical care and constitute just and good cause for discipline. Respectfully, the ruling simply makes little sense. It expands the law beyond good reason.

**{61}** Along the same line, the disclosure of Dr. Yedidag's conduct to Eastern for

disciplinary purposes comes within the Section 41-9-5(A) exception of disclosures "necessary to carry out one or more of the purposes of the review organization[.]" The disclosure of Dr. Yedidag's conduct can be viewed as coming within the purpose of the review organization relating to the care and treatment of patients for at least one or more of the eight purposes expressly enumerated in Section 41-9-2(E).

**{62}** Further, absolute immunity from discipline through a private or implied right of action frustrates an underlying purpose of the ROIA, in that the peer review process is to enhance the provision of good, professional medical care. To absolutely immunize a doctor-member's unprofessional conduct precludes the hospital from assuring that doctors who engage in such conduct are disciplined. It is unreasonable to assume that either the Legislature under the ROIA or Eastern under the employment relationship intended to create or promise by implication a circumstance in which Eastern would forego its responsibility to the public and its own staff to discipline a wayward doctor in exchange for requiring the doctor as part of his or her employment to participate in the peer review process.

**{63}** I see nothing in the ROIA that permits a divination that the Legislature intended to permit a doctor to sue the hospital for violating the disclosure clause when the "disclosure" was behavior during a peer review process that constitutes an express basis of termination under an employment agreement. Nor do I see any basis on which to create an implied promise that Eastern would refrain from any disciplinary action growing out of a member's conduct in a peer review meeting. Dr. Yedidag cites no case that supports his position that he should have absolute or, for that matter, even a qualified immunity, from discipline. His citations to *Summers* and *Southwest Community Health Systems* provide nothing more than general statements as to the goal and purpose of peer review legislation.

**{64}** If permitting discipline tends to chill the peer review process, then rather than the court creating, as it does here, a claim for a ROIA violation or an implied promise, permitting absolute immunity from discipline, the court should leave it to the Legislature to make clear what the more important policy to implement is for the overall policy goal of enhancing medical care.

**{65}** Eastern presents cases from other jurisdictions indicating that courts will not create a private right of action when the statutes provide criminal penalties for violations but do not specifically provide for a private right of action. Dr. Yedidag cites no case to the contrary. In fact, he cites no case that has held that a doctor-member of a peer review committee has a private right of action under a peer review statute to sue his or her hospital-employer for a violation of a confidentiality clause in the statute. At most, if a violation of the ROIA has allegedly occurred, the violation should be used, if at all, only as evidence to support a claim for breach of the employment agreement.

**{66}** It is noteworthy that the jury expressly rejected Dr. Yedidag's claim asserting breach of the implied-in-law covenant of good faith and fair dealing. Even were the implied covenant of good faith and fair dealing an issue, that covenant "cannot be used to overcome

24

or negate an express term contained within a contract." *Sanders v. FedEx Ground Package Sys., Inc.*, 2008-NMSC-040, ¶ 8, 144 N.M. 449, 188 P.3d 1200. Nor can the covenant be construed to imply "new, independent rights or duties not agreed upon by the parties." *A.I. Transp. v. Imperial Premium Fin., Inc.*, 862 F. Supp. 345, 348 (D. Utah 1994) (internal quotation marks and citation omitted).

**{67}**   In addition, and more important, nothing in the employment agreement or the evidence supports any implied-in-fact covenant that can be based on the parties' intentions. *See Davis v. Devon Energy Corp.*, 2009-NMSC-048, ¶ 33, 147 N.M. 157, 218 P.3d 75 ("[I]f a covenant or promise does not operate to impose a duty as a matter of law, any implied obligation must arise from the parties' intentions."). "[I]mplied covenants are not favored in law, especially when a written agreement between the parties is apparently complete." *Cont'l Potash, Inc. v. Freeport-McMoran, Inc.*, 115 N.M. 690, 704, 858 P.2d 66, 80 (1993). Such a covenant cannot co-exist with or override express provisions of the parties' agreement. *Davis*, 2009-NMSC-048, ¶ 29; *Cont'l Potash*, 115 N.M. at 704, 858 P.2d at 80; *Winrock Inn Co. v. Prudential Ins. Co. of Am.*, 1996-NMCA-113, ¶ 18, 122 N.M. 562, 928 P.2d 947.

**{68}**   Finally, the manner in which this case was presented to the jury through the instructions was virtually and effectively a direction to reach a verdict of violation of the statute, leaving only the causation and damages issues for jury consideration. In my view, this was further error requiring reversal.

**{69}**   Instruction No. 4 reads, in pertinent part, that Dr. Yedidag sought damages that he claims were caused by Eastern's breach of the confidentiality requirement in the ROIA and that to establish a violation, Dr. Yedidag had to prove that "[h]is words or actions . . . were protected from disclosure[.]" Instruction No. 7 quoted the ROIA's disclosure provision and then stated: "Transpired means anything that occurred, happened, or took place." The instruction then stated, "[i]f you find from the evidence that Eastern's employees violated [the] statute then Eastern's conduct constitutes negligence as a matter of law." No instruction defined or explained negligence or negligence per se. The fact of "disclosure" was not an issue. The court was instructing the jury that Dr. Yedidag's words or actions necessarily transpired during the meeting and were protected from disclosure and that Eastern violated the statute.

**{70}**   The special verdict form then asked whether Eastern violated the ROIA and, if so, whether the violation caused Dr. Yedidag's damages. The special verdict form states that if the answers are "yes" to these questions, the jury should proceed to award damages in accordance with the damage instruction given by the court. Nothing in the special verdict form mentions negligence or disclosure.

**{71}**   The aggregate of the instructions and the special verdict form tells the jury under no uncertain terms that any and all of Dr. Yedidag's words or actions at the peer review meeting were protected under the ROIA from disclosure and, upon the disclosure by Eastern's

25

employees of any of his words or actions, Eastern violated the ROIA.  The jury had little choice but to answer "yes" on the special verdict form to the question whether Eastern violated the ROIA and then move on to causation.

**{72}**    When asked in oral argument whether some action or conduct by a doctor-member might be disclosable and acted on by a hospital, Dr. Yedidag's counsel's answer was, essentially, that that is not this case.  But when pushed further, counsel conceded that some forms of action or conduct could be outside of the non-disclosure bar.  The concern in this case, as it went to the jury, is not whether Dr. Yedidag's particular manner of questioning was the type of conduct that would fall within or outside of the non-disclosure bar.  The concern is that the jury was instructed that, as a matter of law, any disclosure of a member's action or conduct constituted a violation of the statute simply because the action or conduct transpired during the review process.  The syllogism is:

> The ROIA was violated if conduct that transpired during the process was disclosed.

> Conduct that transpired during the process was disclosed.

> Therefor, the ROIA was violated.

This meant Eastern must be liable.  The jury was given no choice but to find a violation.  And it was instructed that it could award damages upon the violation.

**{73}**    For all of the reasons discussed in this dissent, I would reverse the jury verdict.

_____
**JONATHAN B. SUTIN, Judge**

**Topic Index for _Yedidag v. Roswell Clinic Corp._, No. 31,653**

**ATTORNEYS**
Fees, General

**CONSTITUTIONAL LAW**
Due Process

**CONTRACTS**
Implied Contract

**EMPLOYMENT LAW**
Attorney Fees

Disciplinary Action

26

Employment Contract
Retaliatory Discharge
Termination of Employment

**JURIES**
Juries, General

**MISCELLANEOUS STATUTES**
Review Organization Immunity Act

**REMEDIES**
Punitive Damages

**STATUTES**
Legislative Intent

**TORTS**
Proximate Cause